626 P.2d 310

**Paul SWEENHART, as the Personal Representative of the Estate of Gary L. Sweenhart, deceased, Plaintiff-Appellant,**

v.

**CO–CON, INC. and Mountain States Constructors, Defendants-Appellees.**

**No. 4799.**

Court of Appeals of New Mexico.

Feb. 24, 1981.

Certiorari Denied April 1, 1981.

Paul Wainwright and Gregory V. Pelton, Robinson, Stevens & Wainwright, Albuquerque, for plaintiff-appellant.

Thomas L. Johnson, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for defendants-appellees.

OPINION

WALTERS, Judge.

In this wrongful death case, the trial court granted defendant's motion for summary judgment on grounds of decedent's contributory negligence. We reverse because a material issue of fact exists relative to proximate cause. Since the case must be remanded for trial, we also discuss an evidentiary matter raised by appellant.

1. Summary judgment should only be granted where "there is no genuine issue as to any material fact and [where] the moving party is entitled to a judgment as a matter of law." N.M.R.Civ.P. 56(c), N.M.S.A.1978 (1980 Repl.Pam.); *Oschwald v. Christie*, N.M., 620 P.2d 1276 (1980). The burden is on defendant to show the absence of a genuine issue of fact, and once he has

made such a prima facie showing, the burden shifts to plaintiff to refute it. *Oschwald, supra; Goodman v. Brock*, 83 N.M. 789, 498 P.2d 676 (1972). The party opposing summary judgment is to be given the benefit of all reasonable doubts. *Id.* These rules are so frequently repeated in current decisions that citation to precedent has become redundant.

Defendant, by affidavits, presented the following facts: The assistant director of operations at the office of the state medical examiner obtained a sample of vitreous fluid from decedent's body on the day following Gary Sweenhart's fatal accident. The vitreous fluid sample was taken because defendant had lost too much blood to permit a blood sample to be obtained. The accepted and proper technique for obtaining the sample was followed, and it contained only vitreous fluid; and it was not contaminated in any way.

A chemist with the Bio-Chemistry Division of the Medical Investigator's Office received the vitreous fluid taken from decedent and following "accepted and proper chemical procedure * * * [he] performed a standard gas chromatography test to determine the amount of alcohol contained in the sample." The test, accurate within 5%, indicated that the vitreous sample contained .24 percent alcohol.

Dr. Jim Standefer, a toxicologist for the Medical Investigator's Office, stated in his affidavit that the testing and sampling procedure used to measure the alcohol in Gary Sweenhart's body was proper and followed accepted sampling and testing techniques, and would establish an accurate method of measuring the amount of alcohol in decedent's blood at the time of his death. According to Dr. Standefer, if a 20% correction factor is applied, the level of alcohol in the vitreous corresponds to a similar level in a person's blood. In decedent's case Dr. Standefer calculated that decedent's alcohol blood level could have been as high as .302%, but no lower than .182%.

Using the lower percentage figure, Dr. Standefer concluded that a person with an alcohol level of .182% would suffer the following problems:

(1) The person "would have difficulties with his perception, particularly at night. The person would have a difficult time seeing accurately, would be unable to focus properly on distant objects, and would have impaired peripheral vision."

(2) The person would have a slower reaction time "than a person who is sober."

(3) The person would have "a difficult time coordinating his muscles. He would have an inability to perform fine movements."

(4) The person would "suffer from a lose of critical judgment. The person would find it difficult to make decisions based on his knowledge and perception of the situation. That knowledge and perception would also be impaired thereby aggravating the inability to respond to the situation."

(5) The person would "feel more drowsy than a sober person and would find that his emotions are greatly exaggerated."

(6) The person "would be intoxicated, under the influence of alcohol, and would be incapable of properly and safely operating a motor vehicle and this would contribute to that person's inability to negotiate a mountain curve, whether that curve was properly or improperly marked."

Dr. Standefer noted that the above problems would be even more pronounced if the blood alcohol levels were higher than .182%.

A state police officer who investigated the one-vehicle accident stated that the accident occurred on a portion of South State Road 14 that was under construction. Both ends of the construction zone had signs indicating that the speed limit was 35 m. p. h. throughout the construction project. The officer expressed his opinion that decedent's car was traveling at a speed in excess of 35 m. p. h., and that it turned over three times after leaving the road.

In the opinion of a physics professor, a consultant in accident reconstruction, the curve where decedent's car left the road could be negotiated at a speed in excess of 60 m. p. h., even if the road were damp. He believed that a vehicle travelling 35 miles per hour, leaving the road at the point where decedent left the road, would not have reached the point where decedent's car finally stopped. It was his opinion, therefore, that decedent was travelling in excess of 35 m. p. h. at the time of the accident.

Plaintiff submitted two controverting affidavits. One was from Paul Sweenhart, decedent's brother, and the other was from Larry Ashcraft, decedent's neighbor and friend. Both affidavits contained the following information based on personal knowledge: Decedent lived off Raven Road, which intersects with South State Highway 14. The intersection of Raven Road and South 14 was in the construction zone. On the day of the accident, if a driver travelled north on South 14 from Raven Road, he would not have seen any construction signs along the roadway. In the area where the accident occurred, there was no yellow center stripe on the highway; there was no outer stripe to indicate to a driver the shoulder of the highway. There were no curve reflector markers and there were no reduced speed signs. "There were no signs at all to warn a motorist of the very dangerous curve they were approaching." Immediately off the travelled portion of the roadway were large accumulations of loose sand and gravel. On the morning of decedent's accident, there was a heavy overcast and thick fog at the area where the accident happened. The affidavit of Paul Sweenhart also said:

> The last time I saw my brother was the preceding evening about 7:30 p. m. at the Ponderosa where he was having dinner. My brother left the Ponderosa at approximately 9:00 p. m. On the morning of my brother's death, I went to the mobile home where he resided and found the coffee pot still on and there appeared to be approximately two cups of coffee missing from the pot. I also observed my brother's bed which gave the appearance of having been slept in the night before.

Both affidavits related that the construction companies made subsequent repairs to the portion of the road where decedent's accident occurred. See N.M.R.Evid. 407, N.M.S.A.1978, regarding evidence relating to available precautionary measures. Both affiants stated that on all occasions when they had driven with decedent, he drove in a prudent manner. See N.M.R.Evid. 406(b), N.M.S.A.1978.

Defendants' affidavits establish a prima facie showing of decedent's negligence *per se*, in that decedent was intoxicated and travelling above the posted speed limit, in violation of §§ 66 7 104 and 66–8–102, N.M.S.A.1978. But the mere showing of decedent's negligence is not enough. "Whether decedent failed to exercise reasonable care for his own safety cannot be determined by considering only the actions of decedent." *Fitzgerald v. Valdez*, 77 N.M. 769, 774, 427 P.2d 655 (1967). Defendant's affidavits do not conclusively establish that decedent's negligence was a contributing proximate cause of the accident. *Fitzgerald, supra; Wilkinson v. Randel*, 88 N.M. 629, 545 P.2d 95 (Ct.App.1975). In *Zamora v. J. Korber & Co.*, 59 N.M. 33, 278 P.2d 569 (1954), defendant's employee sold plaintiff's 12-year-old son a rifle in violation of a city ordinance which made it unlawful to sell firearms to minors under the age of sixteen. The boy kept the rifle hidden from his parents. While they were out, the boy shot the rifle at a rock and the bullet ricocheted and hit the boy in the eye, resulting in loss of the eye. The trial court concluded that, as a matter of law, the boy was guilty of contributory negligence which proximately contributed to his injury, and directed a verdict in favor of defendant. The Supreme Court reversed. At 59 N.M. 36, 278 P.2d 569, the court said:

> The question remains whether the negligence of the defendant in selling the rifle to the plaintiff (a minor) could be found to have been the proximate cause of his injury, or whether the intervening conduct of the boy in shooting at a rock as he did prevented such a finding.

We conclude that it was for the jury, in view of all the pertinent considerations of age, maturity, intelligence, experience, and so forth, to decide, under proper instructions on the law, whether or not the boy was guilty of contributory negligence.

Similarly, in *Martin v. Gomez*, 69 N.M. 1, 363 P.2d 365 (1961), the plaintiff contended that by driving on the left hand side of the road, in violation of § 64–18–8, N.M.S.A. 1953, defendant was negligent as a matter of law. The Supreme Court observed: " * * * [T]here are certain statutes a violation of which in and of itself is the proximate cause of an injury. But there are other statutes, such as the one involved in this case, a violation of which may or may not have a causal connection with an ensuing injury." (69 N.M. at 4, 363 P.2d 365.) The Court concluded that contributory negligence is not established until a causal connection between it and the injury is shown.

Causal connection is an unresolved issue in the case before us, and summary judgment was improper.

■ 2. Plaintiff also argues on appeal that the results of alcohol tests conducted by the office of the medical examiner should not have been admitted. The contention is grounded wholly on the argument that neither the Implied Consent Act (§§ 66–8–105 et seq., N.M.S.A.1978) nor the Medical Investigations article (§§ 24–11–1 et seq., N.M.S.A.1978) authorize withdrawal of vitreous fluids from a deceased person. We have some doubt that the medical investigator is without power to determine blood alcohol content, by whatever method, under § 24–11–6 B, N.M.S.A.1978; however, how the sample was obtained and tested is not the question presented and is one which need not be answered in this lawsuit. We are asked to determine the admissibility of the evidence once that evidence has become available and has been offered, and we hold it admissible under N.M.Evid. Rules 402, 702, 703 and 705, N.M.S.A.1978. We observe, further, that even if plaintiff's argument of illegal seizure of evidence were to be sustained in some other proceeding, the exclusionary rule applies only in criminal cases. *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

The summary judgment is reversed. The case is remanded for reinstatement in the trial docket. In accordance with the decision of the Supreme Court filed on February 12, 1981 in consolidated causes No. 13,-235, 13,442, 13,450, and 13,451, *Scott v. Rizzo*, etc., and pursuant to the provisions of the penultimate paragraph of the Court of Appeals' decision in *Claymore and Jordan v. City of Albuquerque,* (1980) (Nos. 4804/4805, 20 N.M.S.B.B. 75), the case is to be tried under the principles of comparative negligence.

IT IS SO ORDERED.

HERNANDEZ, C. J., and LOPEZ, J., concur.