720 P.2d 315

**Longinia D. PONCE, Plaintiff-Appellee,**

v.

**Michael L. BUTTS and State Farm Mutual Automobile Insurance Company, Defendants-Appellants.**

**No. 8795.**

Court of Appeals of New Mexico.

April 29, 1986.

Michael M. Carrasco, Ione E. Gutierrez, Carrasco & Hernandez, P.A., Carlsbad, for plaintiff-appellee.

Robert E. Sabin, Lee Rodgers, Atwood, Malone, Mann & Turner, P.A., Roswell, for defendants-appellants.

## OPINION

GARCIA, Judge.

Michael Butts, (Butts) driver of a vehicle insured by State Farm Mutual Automobile Insurance Company (State Farm), collided with a vehicle in which plaintiff, Longinia Ponce, was a passenger. Plaintiff was injured as a result of the accident; she sought, and received medical care on October 31, 1983, the day of the accident.

Three days after the accident, Edward Streit, a claims adjuster for State Farm, met with plaintiff and obtained a "Patient's Consent" which indicated that plaintiff would be willing to discuss the accident, make a statement, and, if satisfied, agree to a settlement. One week thereafter, on November 10th, plaintiff and her husband signed an "Agreement and Release" in exchange for which State Farm was to pay certain sums of money.

In March of 1984, plaintiff filed suit against Butts and State Farm. In her complaint, she asserted that Butts failed to yield the right-of-way, and that as a proximate cause of his negligence, plaintiff was injured. Plaintiff also contended that State Farm fraudulently induced her to sign the Release.

Defendants moved for summary judgment on the negligence and fraud claims, asserting that there were no material issues of fact and that defendants were entitled to judgment as a matter of law. Defendants submitted the adjuster's affidavit and referred to portions of the depositions of plaintiff and her husband. Plaintiff filed a response in opposition and also filed counter-affidavits. At our request, the depositions relied upon during summary proceedings have been filed with this court.

The district court denied the motion for summary judgment. Thereafter, State Farm filed a separate motion to dismiss the fraud claim, pursuant to NMSA 1978, Civ. P.Rule 12(b)(6) (Repl.Pamp.1980), for failure to state a claim. The trial court denied this motion as well.

The trial court certified for interlocutory appeal issues raised by the denial of summary judgment and the refusal to dismiss. In their application for interlocutory review as to the trial court's denial of summary judgment, defendants raised three subpoints: (1) plaintiff's deposition testimony eliminates any genuine issue as to whether State Farm misrepresented the nature of the release; (2) plaintiff may not set aside the release on the grounds that her injuries turned out to be more serious than she had originally thought them to be; (3) plaintiff failed to meet her burden of showing that evidence could be produced which would establish fraudulent misrepresentation on the part of State Farm's agent.

Defendant State Farm's application for interlocutory review as to the trial court's refusal to dismiss the fraud claim, pursuant to Civ.P.Rule 12(b)(6), presented the question of whether a person who executes a release of an unliquidated tort claim should have a cause of action for fraud against the insurance company who prepared the release. We granted defendants' application for interlocutory appeal. Questions raised by defendants in their brief-in-chief, but not certified by the trial court or considered in granting this interlocutory appeal, will not be considered by this court.

*MRC Properties, Inc. v. Gries*, 98 N.M. 710, 652 P.2d 732 (1982).

We first discuss the initial question of what constitutes a valid release in New Mexico. Next, we examine defendants' assertion that plaintiff failed to meet her burden of showing a material issue as to defendants' misrepresentation. Finally, we determine whether a cause of action exists in New Mexico for the fraudulent procurement of a release of an unliquidated tort claim.

**VALIDITY OF THE RELEASE**

The definition of a valid release relied upon by defendants in this case is contrary to the policy and established judicial construction of the New Mexico Release Act, NMSA 1978, Sections 41–1–1 to –2 (Repl. Pamp.1982).

Defendants argue that any misrepresentation by State Farm's agent in the procural of plaintiff's consent form or release is irrelevant so long as a mechanical compliance with the provisions of the Act is established. According to defendants, because plaintiff failed to disavow the Release within fifteen days of her discharge from the hospital, the validity of the release cannot be attacked.

■ We reject this argument. Prior to the adoption of the Act, a release procured by fraud, undue influence, mutual mistake or coercion was void. *Mitschelen v. State Farm Mut. Auto. Ins. Co.*, 89 N.M. 586, 555 P.2d 707 (Ct.App.1976). The adoption of the Act did not eliminate the releasor's right to void a fraudulently procured release; rather, it expanded the injured party's remedies. *Id.*

In examining the state's public policy relative to releases in a workmen's compensation case, we have stated: "[T]he policy of our law is to favor amicable settlement of claims without litigation when the agreements are fairly secured, are without fraud, misrepresentation, or overreaching, and when they are supported by consideration." *Ratzlaff v. Seven Bar Flying Service, Inc.*, 98 N.M. 159, 646 P.2d 586 (Ct. App.1982); *see also Quintana v. Motel 6,*

*Inc.,* 102 N.M. 229, 693 P.2d 597 (Ct.App. 1984).

■ Defendants' argument that misrepresentation is essentially immaterial flies in the face of the Act's public policy which grants protection to injured individuals. Acceptance of defendants' argument would sanction a practice whereby an unscrupulous adjuster could employ any fraudulent, coercive, or deceitful means to procure a settlement. Once the injured party had signed the release or agreement, failure to disavow within the statutory period, irrespective of the injured party's knowledge of his own victimization, would allow the insurance company to reap the benefit of the agent's improper conduct. Such practices are not condoned in New Mexico. The Act requires fair and impartial conduct by the insurer. *Mitschelson v. State Farm Mut. Auto. Ins. Co.*

We hold, in accordance with the public policy of the Act and previous decisions interpreting this policy, that any settlement procured by the fraud, artifice or overreaching of the insurer's agent, is subject to rescission even if not disavowed in a timely fashion, pursuant to Section 41-1-1(B).

■ We agree with defendants' argument that the Release cannot be set aside on the ground that plaintiff's injury was more serious than originally believed. A release cannot be set aside for mistake as to the severity of a known injury. *Quintana v. Motel 6, Inc.* The fact that we do not dispute this legal precept may not provide much comfort to defendants. Simply because a release cannot be set aside on this ground does not prevent it from being set aside for another valid reason.

## SUMMARY JUDGMENT

■ In their points one and three, defendants essentially deny that plaintiff made a showing, sufficient to avoid summary judgment, on the issue of the company's misrepresentation.

Defendants contend that plaintiff's deposition testimony was not sufficient to counter defendants' prima facie showing of a valid release. Plaintiff argues that there are sufficient factual conflicts between plaintiff's affidavit and deposition and the adjuster's affidavit to preclude summary judgment on the claims presented.

Summary judgment is appropriate when the pleadings and evidence, by way of affidavits, depositions, admissions and answers to interrogatories, demonstrate that there is no issue of material fact and that the moving party is entitled to summary disposition as a matter of law. *Sweenhart v. Co-Con, Inc.,* 95 N.M. 773, 626 P.2d 310 (Ct.App.1981). In summary judgment proceedings, the burden rests on the moving party to demonstrate to the court the absence of a genuine issue of fact; once the moving party has made a prima facie showing, the burden shifts to the party opposing summary judgment to refute it. *Oschwald v. Christie,* 95 N.M. 251, 620 P.2d 1276 (1980).

In determining the existence of a material fact, neither the trial court nor the reviewing court is to weigh the evidence. *Hinojosa v. Nielson,* 83 N.M. 267, 490 P.2d 1240 (Ct.App.1971). The court's function, at this stage of the proceedings, is not to resolve factual disputes, but simply to determine whether such disputes exist.

Summary judgment is a remedy to be employed with great caution. It will not be used as a substitute for a trial on the merits so long as one issue of material fact is present in the case. *Fischer v. Mascarenas,* 93 N.M. 199, 598 P.2d 1159 (1979). Even where the basic facts are undisputed, if equally logical but conflicting inferences can be drawn from the facts, summary judgment should be denied. *Id.* With these concepts in mind, we turn to the depositions and affidavits to determine whether there are material factual conflicts.

The record indicates that plaintiff is Hispanic, has very little formal education, and a minimal ability to read, write or converse in English. Similarly, plaintiff's husband has no formal education, speaks primarily in Spanish and cannot read English. The

discussions between the adjuster and plaintiff were in English. After litigation commenced, an interpreter was used during depositions and for the purpose of preparing plaintiff's affidavit.

In his affidavit, the adjuster testified: "On November 3, 1983, I obtained from Longinia Ponce a written statement that she was willing to give a statement [Patient's Consent] and discuss settlement of a claim * * *." In referring to the same meeting, plaintiff testified in her deposition:

A. [T]hey came to me and asked me to sign this. [patient's consent form] It was to give permission, and they took pictures of the accident.

Q. To give permission for what?

A. To take pictures of the station wagon. That's what I understood.

Later in her deposition, again referring to the November 3rd meeting and to the Patient's Consent which was identified as Exhibit 1, the following exchange took place:

Q. How about this one, Exhibit 1, could you read it?

A. No, I don't know.

Q. Before you signed Number 1, did anyone read it to you?

A. No.

Q. Did you ask anyone to read it to you?

A. No, because even the one that gave it to me didn't explain anything.

Q. No one explained to you what it meant?

A. No. All they said was it was for permission to take pictures of the station wagon.

The adjuster testified that there were bi-lateral negotiations and discussions of settlement between him and the Ponces. He said these discussions ultimately culminated in the execution of an agreement and release, identified as Exhibit 2. Further in his affidavit, the adjuster testified that at all times plaintiff appeared to understand the terms of the settlement. Plaintiff, on the other hand, presented a different view of the process and a different understanding of the terms. In her deposition she was asked:

Q. Did he explain it to you, Number 2 [Release]?

A. What it contained?

Q. What is [sic] meant?

A. No.

Q. Did you ask him to explain it to you?

A. No.

Q. Why did you sign it?

A. Because he said so they could help me heal my arm and that is what I thought it was.

Q. Did you think that it was to pay for the damage to your car?

A. No.

Q. How much money did they give you?

A. How?

Q. Has State Farm paid you any money?

A. No, just the amount they gave me to help me take care of my arm, heal my arm.

Q. Was that $700?

A. Yes, it was five hundred and then seven hundred. One to pay for my arm and one to pay for the car.

Q. Have you received any other money from State Farm?

A. For me?

Q. Yes.

A. No.

In her counter-affidavit, plaintiff testified again to her understanding that the Patient's Consent she signed was for permission to photograph the damaged car. Further, in her counter-affidavit, plaintiff testified:

On November 10, 1983, I signed an Agreement and Release form with the insurance agent, with the understanding that the release was to pay for the damage done to the car, and to pay for the injury to my arm, if additional treatment for it was necessary.

Defendant seizes upon plaintiff's statements in the affidavit and the deposition to prove that plaintiff understood that the Release covered not only the property damage but her physical injury as well. It is this court's duty to examine the whole record in the light most favorable to the trial court's refusal to grant summary judgment. When this is done, it is apparent that there is a factual conflict as to whether any misrepresentation occurred.

Plaintiff's affidavit supports an inference that she was advised that the company would pay for the damage to the car and pay for all future medical treatment for her arm. Plaintiff's affidavit indicates that after her "negotiation with the agent" she believed that the business card he gave her would pay for her medical care for the next 180 days; after which time if her arm still required treatment, further monies would be provided.

Plaintiff's deposition indicates that her reason for signing the Release was the agent's representation that if she signed, "they" would help her heal her arm. There is a clear conflict between the testimony of the agent as to this 180 day limitation on medical treatment and plaintiff's testimony as to what the agent explained to her regarding future medical treatment. Further conflicts are evident when the adjuster's version of the settlement process are compared with Mr. Ponce's.

The adjuster testified that he negotiated for and obtained a written release from both Mr. and Mrs. Ponce. Contrary to the adjuster's testimony concerning "back and forth" negotiations, Mr. Ponce, speaking through an interpreter at his deposition, testified about his participation in the bargaining process:

Q. Did you or your wife and the insurance man bargain back and forth?

A. No, he really didn't talk to me. He talked to the wife. I don't understand English.

At the deposition, Mr. Ponce was questioned about the written Release and was asked to look at the release document. The following exchange ensued:

A. I don't know how to read.

Q. Can you read any of that?

A. No.

Q. Do you need glasses to read?

A. Well, right now, yes. It has been about two months since I got the glasses.

Q. Could you read it with your glasses on?

A. What is wrong is that I can't read English.

Concerning the terms of settlement, Mr. Ponce was asked:

Q. Did he [adjuster] explain to you what the document meant?

A. He was going to pay me $200 so my insurance company would be fixed, to fix my car.

Q. Did he explain anything else to you?

A. No, he didn't explain anything else.

Q. Let's try this one again. Do you know what a deductible is in an insurance policy?

A. No.

On page 13 of his deposition Mr. Ponce was asked:

Q. Did the insurance man explain to you why you should sign the document?

A. Yes. What he told us was that he was going to give us $200 and then $500 for my wife so she could get cured.

Q. Was the $500 for your wife's shoulder?

A. Yes.

Q. Did he ever pay you the $500?

A. Well I don't remember if he did pay them or not. He said he was going to give us another three thousand.

Q. How did you understand all this?

A. Well, what little my wife knows, she told me.

Q. Did you ever receive the $3,000?

A. No.

Q. Did you ever ask for it?

A. He said he was going to give us three thousand in medicals for my wife. I asked him to give me the $3,000 because I knew something about 180 days and it wouldn't accumulate in 180 days, but he refused to give them to me.

Q. Did he also agree to give you—Did he also agree to pay the medical bills that your wife had incurred up to the time you signed this?

A. Yes.

The conflicting information in the depositions and affidavits before the trial court indicates significant material disputes. The adjuster testified that he negotiated back and forth with Mr. Ponce. That is denied by Mr. Ponce. Mr. and Mrs. Ponce indicate that they were given misinformation as to the documents that they were signing. The adjuster testified that the first document was a consent to negotiate and to settle the case and that the second document was an agreement and settlement. The Ponces, on the other hand, testified that the first document was represented as simply a permission to photograph the car. Mr. and Mrs. Ponce disagree with one another and with the adjuster as to the terms of the second document and the basis of the bargain.

Similarly, there are conflicts between plaintiff's affidavit and deposition concerning the terms of the settlement. With these conflicts, the trial court properly determined that there were material issues of fact in dispute as to the consent form and the release, which would preclude summary judgment.

**WHETHER A CAUSE OF ACTION EXISTS AGAINST DEFENDANT STATE FARM FOR FRAUD IN THE PROCUREMENT OF THE RELEASE OF AN UNLIQUIDATED TORT CLAIM**

■ Defendants requested and were granted separate trials on these issues: (1) the validity of the Release signed by plaintiff; and (2) the negligence, if any, of defendant Michael Butts. Defendants' Rule 12(b)(6) motion to dismiss was denied by the trial court as to plaintiff's claim for fraudulent procurement.

On appeal, defendant contends, as he contended in the trial court, that no such cause of action exists because: (1) a person who has been fraudulently induced into signing a release has not been injured, and (2) damages arising from the alleged misrepresentation would be too speculative.

We note that the question of the agent's misrepresentation or fraudulent inducement is central to the issue of the validity of State Farm's Release and that the "validity" trial is the proper forum for the presentation of evidence and argument on the alleged improper procurement of the release. Thus, in keeping with our grant of interlocutory appeal in this matter, as well as with our policy to avoid piecemeal litigation and conserve judicial resources, we determine whether a cause of action exists for fraudulent inducement under the circumstances of this case. *See generally Cole v. McNeill*, 102 N.M. 146, 692 P.2d 532 (Ct.App.1984).

Plaintiff's claim for fraudulent inducement alleges that the Patient Consent form and the Release were fraudulently procured by State Farm's agent as a result of various misrepresentations made to plaintiff. To sustain an action for fraud in New Mexico, plaintiff is required to show that a false representation was made with the intent to deceive; for the purpose of inducing the other party to act and that the other party did rely and act on it to his own injury. *Wirth v. Commercial Resources, Inc.*, 96 N.M. 340, 630 P.2d 292 (Ct.App. 1981); *see e.g., Chavez v. Chenoweth*, 89 N.M. 423, 553 P.2d 703 (Ct.App.1976). Plaintiff has made the allegations necessary to state a claim for fraud. *See generally Church v. Church*, 96 N.M. 388, 630 P.2d 1243 (Ct.App.1981); *see also* cases collected in Annot. 39 A.L.R.3d 729 (1971).

Defendant argues that a cause of action for fraud based on the fraudulent procurement of the release of an unliquidated claim should not be recognized in New Mexico. Defendant does not discuss *Montoya v. Moore*, 77 N.M. 326, 422 P.2d 363

(1967), where the New Mexico Supreme Court ruled that a suit in tort for fraudulent misrepresentation was a proper remedy for an insured who sought recovery against his insurance company for fraud on the part of the insurer's adjuster in obtaining a release. *Montoya* involved a suit by an insured against his own insurer but the court did not rely on this fiduciary relationship in concluding that the release had been fraudulently obtained. Rather, the *Montoya* court stated the general rule that "the exercise of undue influence in order to secure something of value from the person or persons so influenced is but a specie of fraud * * *." (Citation omitted.) *Id.* 77 N.M. at 331, 422 P.2d 363. In *Chavez v. Chenoweth,* this court specifically approved plaintiff's fraud claim against the defendant insurance company where plaintiff alleged that she relied on the misrepresentations of the company's agent. *Chavez* concerned "arms-length" dealings between plaintiff and defendant tort-feasor's insurance company. No fiduciary relationship existed between plaintiff and defendant insurance company.

In *McGeehan v. Bunch,* 88 N.M. 308, 540 P.2d 238 (1975), the New Mexico Supreme Court stated that the prevention of fraud is a "valid state interest." The court further noted that New Mexico courts should "take notice" of fraud when found to exist in particular instances. *Id.* 88 N.M. at 314, 540 P.2d 238.

In keeping with the supreme court's admonition and with its recognition of a fraud claim by an insured against the insurer under similar factual circumstances in *Montoya,* we decline to follow the authorities cited by defendant which hold that plaintiff's cause of action should not be recognized. Rather, while we recognize the split of authority on the matter, we decide to follow the line of cases which hold that an action for fraud is available to one who executes a release of an unliquidated tort claim. *See Ware v. State Farm Mutual Automobile Ins. Co.,* 181 Kan. 291, 311 P.2d 316 (1957); *Kordis v. Auto Owners Ins. Co.,* 311 Mich. 247, 18 N.W.2d 811 (1945); *see also Pattison v. Highway In-* *surance Underwriters,* 278 S.W.2d 207 (Tex.Civ.App.1955). We note that plaintiff's claim involves an election of remedies and not a cause of action in addition to the original negligence case.

As to defendants' contention that plaintiff has suffered no injury because a fraudulently obtained release is void, the Kansas Supreme Court in *Ware,* when presented with the same argument, stated what we believe to be the proper response:

> There is no merit to this contention. When plaintiffs signed the release of their cause of action against the assured * * * they gave up a valuable right * *.
>
> * * * It is a well-established rule that where a release of a cause of action is procured by fraud the defrauded party may choose any one of these remedies: (1) he may return the consideration paid for the release, thereby rescinding the transaction; (2) he may sue for a rescission and offer to return the consideration; or (3) he may waive his right to rescind and sue to recover any damages suffered by reason of the fraud perpetrated upon him.

181 Kan. at 296, 311 P.2d at 320.

Further, while we agree with defendants that damages based upon surmise, speculation and conjecture cannot be sustained, we note the oft-repeated rule that a wrongdoer will not escape liability because his victim cannot prove his loss with absolute certainly. *Kordis v. Auto Owners Ins. Co.* While there may be uncertainty associated with the exact amount of damages, it does not serve to bar plaintiff's claim. The lack of certainty that will prevent a recovery is uncertainty as to the fact of damages and not as to the amount. *Wirth v. Commercial Resources, Inc.*

We express no opinion as to plaintiff's ability to prove injury beyond reiterating that in signing the Release, plaintiff agreed to give up a valuable right. Whether there was misrepresentation involved in the signing of the Release and any resulting injury to plaintiff are matters left to the triers of

fact. We merely hold that in keeping with the court's policy of suppressing fraudulent practices and protecting the citizens of this state from unfair business practices, plaintiff may go forward with her tort claim for fraudulent misrepresentation in procuring the release of an unliquidated claim.

The trial court is affirmed as to both its denial of summary judgment and its denial of defendants' motion to dismiss for failure to state a claim.

Plaintiff shall recover her appellate costs.

IT IS SO ORDERED.

ALARID and MINZNER, JJ., concur.