2003-NMCA-085

73 P.3d 215

Gilbert and Barbara APODACA; and Jeffrey and Larissa Velasquez, Plaintiffs–Appellants/Cross–Appellees,

v.

AAA GAS COMPANY, a New Mexico corporation, LP Gas Equipment Inc., a New Mexico corporation, Defendants–Appellees/Cross–Appellants.

Nos. 22,087, 21,946.

Court of Appeals of New Mexico.

March 11, 2003.

Certiorari Granted, No. 28,046, May 28, 2003.

Ron Morgan, Rowena Averion–Mahloch, Mark Goodman, Morgan Law Office, Ltd., Michael B. Browde, Albuquerque, for Appellants/Cross–Appellees.

H. Brook Laskey, Gary L. Gordon, Alice Tomlinson Lorenz, Miller, Stratvert & Torgerson, P.A., Charles A. Pharris, Thomas C. Bird, Robert J. Perovich, Keleher & McLeod, P.A., Albuquerque, for Appellees/Cross–Appellants.

*OPINION*

BUSTAMANTE, J.

{1} This is an appeal from a civil jury verdict in favor of Defendants denying Plaintiffs damages for personal injury and property loss. Plaintiffs raise seven points of error: (1) refusing a jury instruction for ultrahazardous activity; (2) instructing the jury that the Liquefied Petroleum Gases Handbook of the National Fire Protection Association No. 58 (NFPA 58) applied to Plaintiffs and their employer, Cañada, Inc. (Cañada); (3) allowing the admission of a hospital statement; (4) denying their motions to amend complaint against LP Gas Equipment, Inc. (LPGE); (5) denying separate peremptory challenges for Plaintiff-spouses; (6) excluding expert testimony pertaining to loss of enjoyment of life; and (7) dismissing punitive damages claim against LPGE.

{2} On cross-appeal, Defendant AAA Gas Company (AAA Gas) objects to the trial court's rulings: (1) allowing the jury to consider punitive damages, (2) allowing the jury to consider strict liability for nondelegable duty, and (3) denying them costs.[1]

{3} We affirm the judgment of the trial court as to Plaintiffs' points one through five, as well as its denial of costs. Because we affirm, we do not reach Plaintiffs' expert testimony and punitive damages issues or the jury instruction issues raised by AAA Gas.

**FACTS**

{4} On July 29, 1997, Plaintiffs Gilbert Apodaca and Jeffrey Velasquez suffered serious personal injuries when a propane tank they were repairing leaked liquid propane and exploded. A third mechanic, Joe Salazar, suffered severe injuries which led to his death on August 14, 1997. Apodaca, Velas-

---

1. AAA Gas also requests sanctions under Rule 12–312(D) NMRA 2003 arguing that Plaintiffs' counsel referred to deposition statements that were not admitted as substantive evidence at trial. We deny the request.

quez, and Salazar were employed as mechanics by Cañada, a repair shop that advertised itself as specializing in the repair of utility equipment, including liquid propane delivery trucks. AAA Gas, a seller of propane, owned the liquid propane gas and delivery truck involved in the explosion. LPGE, a distributor of liquid propane gas equipment, sold the internal cargo tank valve at issue, as a distributor of Fisher Controls, Inc. (Fisher Controls).

{5} On July 14, 1997, AAA Gas delivered one of its delivery trucks to Cañada for repair of a belly valve that would not close. Cañada requested AAA Gas to pick up the truck to empty the propane from the tank so the valve and pump could be replaced. After retrieving and emptying the truck, it was returned to Cañada, and Cañada performed certain repairs. AAA Gas retrieved the truck on July 25 and after testing the system, discovered that the tank still would not pump propane. After several attempts to troubleshoot the problem, AAA Gas called Cañada, which instructed AAA Gas to bring the truck back to the shop a third time.

{6} At trial the parties disputed whether AAA Gas informed Cañada that there was propane in the truck when it arrived at Cañada's garage the third time. However, it was undisputed that the truck was about eighty percent full of propane. Salazar moved the loaded truck into the garage for repair. When Salazar loosened the bolts under the pump, there was a sudden release of liquid propane. The propane reached an ignition source after Salazar and Apodaca made their way to the back of the truck. Salazar died of his injuries, Apodaca suffered severe third degree burns to twenty percent of his body, and Velasquez suffered second degree "flash" burns to over thirteen percent of his body.

**PROCEEDINGS**

{7} Salazar's estate filed a complaint for wrongful death in Valencia County. *Jarner ex rel. Salazar v. AAA Gas Co.*, No. VA–97–1403–CV. Plaintiffs intervened in the Valencia County suit on May 25, 1999. However, Plaintiffs' claims were dismissed without prejudice for improper venue on February 21, 2000, after Salazar's claims were settled

and his suit against Defendants was dismissed.

{8} Plaintiffs filed the present action in Bernalillo County. The complaint alleged negligence and products liability against AAA Gas, LPGE, and Fisher Controls. Specifically, Plaintiffs alleged AAA Gas was directly and vicariously liable under theories of common law negligence, negligence per se, and products liability for failing to remove propane from the truck before delivering it for repair. Plaintiffs alleged LPGE and Fisher Controls were negligent or strictly liable for providing a defective valve. In addition to compensatory and punitive damages sought by Apodaca and Velasquez, their wives sought damages for loss of consortium and spousal services.

{9} Some three months later, on May 15, 2000, Plaintiffs moved to amend their complaint against LPGE after discovering that Fisher Controls had not supplied the valve involved in the explosion. The amended complaint alleged LPGE had violated the Unfair Practices Act (UPA), NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1999), by misrepresenting the valve actually involved as new and unused. The amended complaint also alleged AAA Gas had created an ultrahazardous condition by delivering the truck for repair loaded with propane in violation of the Albuquerque Fire Code, which prohibits the repair of a cargo tank system inside a building unless all liquid propane gas is removed and the system purged. A supplemental motion to amend complaint was filed on May 22, 2000, to detail claims against LPGE and withdraw allegations against Fisher Controls.

{10} The trial court dismissed Fisher Controls with prejudice on May 26, 2000, as a result of a settlement agreement with Plaintiffs and, on June 6, 2000, the trial court then denied Plaintiffs' motions to amend. Plaintiffs in turn filed a second complaint against LPGE in the Bernalillo County District Court on June 28, 2000, essentially restating the allegations contained in their motions to amend—that LPGE misrepresented the valve involved as new and unused, and charging LPGE with one count for the UPA violation and one count of misrepresentation. On

February 6, 2001, the trial court dismissed this second complaint on summary judgment in favor of LPGE on res judicata and/or collateral estoppel grounds. Plaintiffs timely appealed that decision.

{11} The first complaint was tried before a jury of twelve. At the conclusion, the jury answered special interrogatories in favor of Defendants on all theories of liability. The jury answered "no" to whether AAA Gas was negligent and "no" to whether AAA Gas failed to take reasonable precautions necessary to avoid harm. The jury also answered "no" to whether LPGE was negligent and "no" to whether LPGE was liable under products liability. The trial court·entered a judgment on the verdict and denied Plaintiffs' motion for a new trial. Plaintiffs timely filed this appeal, which is a consolidation of the two cases filed in Bernalillo County District Court.

{12} We review each of the above issues in the order presented on appeal.

## I. Ultrahazardous Activity

{13} Plaintiffs contend that the trial court erred in refusing to instruct the jury on strict liability for ultrahazardous activity. *See* UJI 13–1627 NMRA 2003. Instead of submitting Plaintiffs' requested instruction 13–1627, the court instructed the jury under UJI 13–1601 NMRA 2003 (negligence) and UJI 13–1634 NMRA 2003 (strict liability for nondelegable duties). These instructions, Plaintiffs argue, were inadequate and confusing because they are theories based in negligence rather than strict liability.

{14} Plaintiffs argue that AAA Gas alone had special responsibilities for any hazard arising from the extremely volatile and explosive nature of the propane. Whereas AAA Gas was licensed, trained in the safe handling and storage of propane gas, and specifically knowledgeable in the safety requirements for having their trucks repaired in a mechanics garage, Plaintiffs correctly note that they were not required to be licensed and assert they had no special training in the safe handling of propane gas. Plaintiffs characterize the ultrahazardous activity as the "delivery of a loaded truck for [mechanical] repairs to those not expert and trained in handling l.p. gas ... [at a repair shop located in the heart of Albuquerque]."

## Standard of Review

{15} The question whether an activity is ultrahazardous or "abnormally dangerous" is determined by the court. Restatement (Second) of Torts § 520 cmt. 1 (1977) (hereinafter Restatement). Abnormally dangerous activity as referred to in Restatement (Second) of Torts §§ 519–20 (1977) is recognized to be the same as what was previously referred to as "ultrahazardous activity" in the first edition of Restatement of Torts §§ 519–20 (1938). *Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 397 n. 8, 827 P.2d 102, 112 n. 8 (1992). This inquiry is different from questions of negligence, or the failure to use reasonable care, which is a question for the jury. Restatement cmt. 1. "[S]trict liability ... involves a characterization of the defendant's activity or enterprise itself, and a decision as to whether he is free to conduct it at all without becoming subject to liability for the harm that ensues even though he has used all reasonable care." *Id.* Thus, the determination of whether an activity is abnormally dangerous is a question of law for a court to decide. *See Fernandez v. Walgreen Hastings Co.*, 1998–NMSC–039, ¶ 1, 126 N.M. 263, 968 P.2d 774 (determining whether plaintiff alleges a valid theory upon which relief may be granted is a pure question of law); *see also Saiz*, 113 N.M. at 395–96, 827 P.2d at 110–11 (comparing abnormally dangerous activity to inherently dangerous activity which is a question of law). Questions of law require de novo review. *Gabaldon v. Erisa Mortgage Co.*, 1999–NMSC–039, ¶ 7, 128 N.M. 84, 990 P.2d 197.

## Analysis

{16} The doctrine of strict liability for an abnormally dangerous activity derives from the notion that " 'one who conducts [the activity] should prepare in advance to bear the financial burden of harm proximately caused to others by such activity.' " *Arlington Forest Assocs. v. Exxon Corp.*, 774 F.Supp. 387, 389 (E.D.Va.1991) (mem.) (quoting C. Morris & C.R. Morris on Torts, Ch. IX at 231 (2d ed.1980)). It is a "social policy

[that] requires the defendant to make good the harm which results to others from abnormal risks which are inherent in activities that are not considered blameworthy because they are reasonably incident to desirable industrial activity." *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 467 P.2d 635, 637 (1970). "The basis of the liability is the intentional behavior [that exposes] the community to the abnormal risk[s]." *Id.* Abnormal risks "will be tolerated by the law, but [the company] must pay its way by insuring the public against the injury it causes." *Arlington Forest Assocs.*, 774 F.Supp. at 389–90 (internal quotation marks and citation omitted). In short, the company is the insurer of the activity because it is impossible to eliminate the abnormal risk of the activity. The doctrine is not to be imposed where negligence law provides an adequate remedy.

{17} Strict liability was developed "to govern accidents that negligence liability cannot adequately control." *Indiana Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1177 (7th Cir.1990). The doctrine provides a remedy for uncommon and extraordinarily dangerous activities where negligence liability is an inadequate deterrent or remedy. *See, e.g., Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 375–77, 902 P.2d 54, 57–59 (1995). And, it "imposes responsibility upon persons engaged in such activities for any resulting harm even though all reasonable precautions have been taken against the risk of harm the activity creates." *Saiz*, 113 N.M. at 397, 827 P.2d at 112. But where the "hazards of an activity can be avoided by being careful ..., there is no need to switch to strict liability." *Indiana Harbor Belt R.R. Co.*, 916 F.2d at 1177.

{18} New Mexico first recognized the doctrine of strict liability for ultrahazardous activities in *Thigpen v. Skousen & Hise*, 64 N.M. 290, 293, 327 P.2d 802, 805 (1958). In that case, the Court adopted Sections 519 and 520 of the Restatement. *First Nat'l Bank v. Nor–Am Agric. Prods., Inc.*, 88 N.M. 74, 79, 537 P.2d 682, 687 (Ct.App.1975); *see also Saiz*, 113 N.M. at 397 & n. 8, 827 P.2d at 112 & n. 8 (indicating that the court now follows Section 519 of the Restatement). Since *Thigpen*, our courts have measured a number of activities against the ultrahazardous standard, refusing to apply the theory to any. *See, e.g., Saiz*, 113 N.M. at 397, 827 P.2d at 112 (installing high voltage lighting system is not ultrahazardous); *Gutierrez v. Rio Rancho Estates, Inc.*, 93 N.M. 755, 757, 605 P.2d 1154, 1156 (1980) (declining to impose strict liability for artificial collection and channeling of large quantities of water in rural area); *Rodgers v. City of Loving*, 91 N.M. 306, 310, 573 P.2d 240, 244 (Ct.App. 1977) (burning weeds in open field within city limits and near buildings is not ultrahazardous); *First Nat'l Bank*, 88 N.M. at 79, 537 P.2d at 687 (marketing highly toxic chemical commonly used as a seed disinfectant is not ultrahazardous); *Otero v. Burgess*, 84 N.M. 575, 577, 505 P.2d 1251, 1253 (Ct.App.1973) (storing dynamite is not ultrahazardous).

{19} Defendants argue that ultrahazardous activity should be limited to dynamite blasting, asserting that because our courts have refused to extend the doctrine beyond such cases, we should not do so here. However, this Court is not foreclosed from such a finding, if the facts warrant. *See Thigpen*, 64 N.M. at 294, 327 P.2d at 805 (adopting Restatement Sections 519 and 520 and noting blasting is *one type* of ultrahazardous activity); *see also Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 842 F.Supp. 475, 477–78 (D.N.M.1993) (mem. & order) (noting that the doctrine has not been extended beyond blasting is only an "historical observation"). Thus, an analysis of the Restatement factors is appropriate.

{20} Section 519 of the Restatement sets forth the general rule regarding strict liability in tort for abnormally dangerous activities as follows:

(1) [o]ne who carries on an abnormally dangerous activity is subject to liability for harm ... resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

{21} Section 520 of the Restatement defines "abnormally dangerous" as "abnormal dangers [that] arise from activities that are

in themselves unusual, or from unusual risks created by more usual activities under particular circumstances." Restatement § 520 cmt. f. The Restatement then sets out six factors that a court must consider in determining whether an activity is abnormally dangerous.

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement § 520. The commentary explains that the court must consider each factor, apportioning weight to each in accordance with the evidence. *See id.* cmts. f & l. While each factor need not be present, "ordinarily several of them will be required for strict liability.... [although] it is not necessary that each of them be present, especially if others weigh heavily." *Id.* cmt. f. According to Restatement Section 520, "[t]he essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even ... without the need of a finding of negligence." *Id.*

### High Degree of Risk and Likelihood of Harm Will Be Great

■ {22} Defendants concede that factors (a) and (b) are satisfied because propane is a flammable gas that explodes when ignited by the smallest spark. Plaintiffs' recitation of the facts highlights these factors:

[A]ny escape of propane ... has a virtual certainty of exploding because the tiniest spark will ignite it. It expands from its liquid state *270 times* its volume into a gaseous state the instant it is released into the atmosphere. It is heavier than air and

therefore develops vapor clouds from the ground up ... Once it is in an unconfined gas form, l.p. gas is no longer controllable and can easily be ignited by any number of unsuspicious ignition sources, including static electricity produced by clothing or a dropped tool; indeed, "l.p. gas seeks an ignition source."

Given these facts and Plaintiffs' injuries, the likelihood of great harm from a propane explosion is obvious. Factors (a) and (b) have been satisfied.

### Elimination of Risk by the Exercise of Reasonable Care

■ {23} Although the Restatement instructs courts to consider each factor, the question of whether reasonable care can eliminate the high degree of risk is often central to the determination of whether an activity is abnormally dangerous. *Arlington Forest Assocs.*, 774 F.Supp. at 390; *Koos v. Roth*, 293 Or. 670, 652 P.2d 1255, 1263 (1982); *McLane*, 467 P.2d at 638; *Erbrich Prods. Co. v. Wills*, 509 N.E.2d 850, 857 n. 3 (Ind.Ct. App.1987). This is so because it is the inability to eliminate the risks by taking precautions that distinguishes strict liability from negligence. *See Saiz*, 113 N.M. at 396–97, 827 P.2d at 111–12.

■ {24} While some jurisdictions read Restatement § 520(c) to require a complete elimination of the risk, *see, e.g., McLane*, 467 P.2d at 638; *Zero Wholesale Gas Co. v. Stroud*, 264 Ark. 27, 571 S.W.2d 74, 76, 78 (1978), the elimination of any and all risks is virtually impossible in most cases. This Court finds the better rule is that subsection (c) refers to an inability to eliminate the high degree of risk, i.e., an inability to reduce the risk to reasonable levels. *See* Restatement § 520 cmt. h; *Arlington Forest Assocs.*, 774 F.Supp. at 390 n. 4; *New Meadows Holding Co. v. Washington Water Power Co.*, 102 Wash.2d 495, 687 P.2d 212, 216 (1984) (en banc). "[A]nything can happen. The question is, how likely is this type of accident if the actor uses due care?" *Indiana Harbor Belt R.R. Co.*, 916 F.2d at 1179.

{25} Undeniably, propane is a dangerous substance, but reasonable precautions can

reasonably reduce the risk of, if not prevent, explosions. *See generally* NFPA 58; *Searle v. Suburban Propane Div. of Quantum Chem. Corp.*, 263 A.D.2d 335, 700 N.Y.S.2d 588, 591 (App.Div.2000) (finding installation and maintenance of a propane gas storage tank did not constitute an ultrahazardous activity since reasonable precautions can be taken to prevent explosion); *Travelers Ins. Co. v. Chrysler Corp.*, 845 F.Supp. 1122, 1125 (M.D.N.C.1994) (mem. & order) (declining to extend strict liability to propane powered vehicles because of the low risk of harm with the exercise of reasonable care); *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 587–89 (Colo.1984) (en banc) (instructing on degree of care required of propane suppliers in negligence claim). Moreover, Plaintiffs and Defendant AAA Gas agree the accident could have been avoided if the tank and its delivery system had been purged of propane or the repair had been performed outside the garage.

{26} To avoid the necessary consequences of these facts, Plaintiffs define the activity subject to strict liability to include characteristics of the Plaintiffs that made the situation more dangerous handing over a fully loaded propane truck for repair to mechanics, *who are unlicensed and inexperienced in the safe handling of propane, at a repair shop located in the heart of Albuquerque.* In short, Plaintiffs' position is that no amount of reasonable care can make the repair safe when the truck is fully loaded and handed over to inexperienced mechanics. However, Plaintiffs' characterization would swallow the rule.

> For strict liability purposes, the danger cannot be predicated on mere causal or collateral negligence of others with respect to [the activity] under the particular circumstances .... [Plaintiff's] particularized approach to defining the nature of an activity would, in effect, enable plaintiffs to invoke strict liability for all negligently-conducted activity.

*Arlington Forest Assocs.*, 774 F.Supp. at 392 (internal quotation marks and citation omitted). "Any plaintiff in a negligence action could simply characterize the offending behavior as incapable of being safely performed even with due care, thus bringing it within the scope of strict liability." *Id.*

{27} The fact remains that if Defendants had delivered the tank unloaded and purged of gas, or if Plaintiffs had repaired the truck outside the garage, the risk of an explosion would likely have been greatly reduced. *See* NFPA 58, §§ 6–6.2.2(a), 6–6.2.3(c). This is not a case where the risk of harm is *impossible to predict* because serious injuries may result despite every reasonable precaution. *See Thigpen*, 64 N.M. at 294, 327 P.2d at 805 ("Blasting is ultrahazardous because high explosives are used and *it is impossible to predict* with certainty the extent or severity of its consequences.") (quoting Restatement § 520(c)) (emphasis added); *see also Philip Morris Inc. v. Emerson*, 235 Va. 380, 368 S.E.2d 268, 282 (1988) (denying strict liability for negligent release of pentaborane gas since, unlike blasting which is impossible to predict, all parties had the ability to eliminate the risk of injury by exercising reasonable care). *But see Siegler v. Kuhlman*, 81 Wash.2d 448, 502 P.2d 1181, 1187 (1972) (en banc) (transporting gasoline by truck on highway involved high degree of risk that could not be eliminated—reasonable care could not ensure against "concealed or latent mechanical or metallurgical defects in the carrier's equipment, ... negligence of third parties, ... latent defects in the highways and streets, and ... all of the other hazards not generally disclosed or guarded against by reasonable care").

{28} The high degree of risk inherent in an activity can be reduced to a minimum by compliance with adequate regulations. The handling of liquid propane is heavily regulated by a nationally recognized regulatory code that was adopted by state law and city ordinance at the time of the accident. *See* NFPA 58; State Liquefied Petroleum Gas and Compressed Natural Gas Act ("LPG & CNG Act"), NMSA 1978, §§ 70–5–1 to –23 (1947, as amended through 1999); Albuquerque Fire Code, § 14–2–1(B)(3) (1993). As discussed below, the national standard, as adopted by New Mexico, applies to the general public within the state, and, as adopted by the City of Albuquerque, it applies to all commercial businesses within the city. Pro-

pane is relatively safe if it is handled in accordance with these regulations. It is when the precautions prescribed by NFPA 58 are not taken that handling propane becomes extremely dangerous.

{29} Moreover, Plaintiffs have offered no reason why the negligence regime is inadequate to remedy or deter accidental explosions resulting from the repair of a loaded propane truck. Propane is highly flammable, but there is no evidence it is so corrosive or otherwise destructive that it will unpredictably damage or weaken a tanker's valve or delivery system. The cause of the explosion in this case was carelessness—whether it was a defective valve supplied by LPGE, or the delivery of a loaded propane tank by AAA Gas, or the mechanics' decision to pull the truck into the garage for repair, or any combination of these factors. "Accidents that are due to a lack of care can be prevented by taking care; and when a lack of care can . . . be shown in court, such accidents are adequately deterred by the threat of liability for negligence." *See Indiana Harbor Belt R.R. Co.,* 916 F.2d at 1179; *see also Arlington Forest Assocs.,* 774 F.Supp. at 390. Strict liability is appropriate only where the activity remains dangerous despite all reasonable precautions. *Id.* at 391. Since some precautions could have reasonably reduced the danger of repairing the propane truck, this factor has not been satisfied.

### Uncommon Usage

{30} The Restatement defines common usage as an activity "customarily carried on by the great mass of mankind or by many people in the community." Restatement § 520 cmt. i. It is the activity, not the substance, that must be of common usage. *Indiana Harbor Belt R.R. Co.,* 916 F.2d at 1181. The fact that an activity is not carried on by the "great mass of mankind," however, is not decisive. What is customary activity in the community has come to encompass customary industrial activity throughout the country. *See, e.g., New Meadows Holding Co.,* 687 P.2d at 216 (concluding underground transmission of gas by large utility companies is matter of common usage); *Johnson & Johnson v. First Nat'l Bank,* 268 Ark. 726, 594 S.W.2d 870, 872 (1980) (stating that while "CS$^2$ may be an uncommon gas, . . . it [is] more important that it be uncommon for industrial operations to store and use potentially dangerous gases in pipes in factories in industrial areas"); *First Nat'l Bank,* 88 N.M. at 79, 537 P.2d at 687 (marketing of Panogen was matter of common usage where "grain treatment had wide acceptance and use throughout the country at the time of the . . . incident"); *Arlington Forest Assocs.,* 774 F.Supp. at 391 (storing and removing gas from commercial underground storage tanks is not "carried on by the great mass of mankind . . . [but] filling stations with underground storage tanks are commonplace in most communities throughout the country") (internal quotation marks omitted). Thus, in order to satisfy this Restatement factor, "the activity . . . [must be] uncommon in the circumstances in which it causes injury." *Johnson & Johnson,* 594 S.W.2d at 872.

{31} AAA Gas cites to the widespread use of propane in every town, home, and business, noting that anyone can buy propane at the convenience store. However, the focus of factor (d) is not on the *substance* but on whether the *activity* is commonplace. Thus, Plaintiffs' argument that repairing a loaded propane truck is uncommon to the mass of our citizenry is appropriate. The more accurate question here, however, is whether delivering loaded propane trucks for repair is uncommon industrial activity across the country. Plaintiffs have offered no such evidence. To the contrary, at least two witnesses testified that delivering a propane truck for repair with propane in the tank and delivery system to assist in troubleshooting is common in the industry. Therefore, on balance, this factor is not satisfied.

### Appropriateness of Locale

{32} Restatement Section 520(e) considers the appropriateness of an activity to its location. According to the Restatement, this factor is sometimes referred to as strict liability for a " 'non-natural' use of the defendant's land." Restatement § 520 cmt. j. In other words, the activity "must be . . . inappropriate to the place where it is maintained,

in the light of the character of that place and its surroundings." *Otero*, 84 N.M. at 579, 505 P.2d at 1255 (internal quotation marks and citation omitted).

{33} Plaintiffs, in effect, argue that their own employer's business was situated in a locale that was inappropriate for working on propane tanks, yet two to five percent of their business, about six trucks in the six months prior to the accident, involved such work. The remaining business involved heavy industrial equipment. At the time of the accident, Cañada was located a few hundred feet from the Wyoming gate of Kirtland Airforce Base, surrounded by residential and commercial property. An Albuquerque Fire Department investigator testified that he believed there were some repair shops like Cañada around town but he was unsure of the number.

■ {34} Given that the property was surrounded by commercial property and that Plaintiffs do not argue otherwise, we assume the property was zoned for commercial use. Thus, Cañada was not improperly located from that standpoint. The record reveals no information either about the location of Cañada's customers or other shops providing the same services as Cañada. It can reasonably be said that Defendants have no choice but to take their trucks to locations where there are shops to service them. It would be unrealistic to hinge imposition of strict liability on the existence of a hypothetical mechanic in the countryside or to expect mechanics to move their businesses out of town and away from other customers. The simple proximity of residences to Cañada's garage is not enough to meet the requirements of this factor.

### Value to the Community

{35} "Even though the activity involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one." Restatement § 520 cmt. k. Propane has clear value to the community given its prevalent use in industry, residential heating, and recreation. *See New Meadows Holding Co.*, 687 P.2d at 216.

It seems to us that to have propane safely delivered, it is desirable that the delivery trucks be in good working order. Thus, repairing propane trucks is inherently valuable to the community. Moreover, despite the danger, the state and city allow the handling of propane by imposing regulations to minimize the risk. The value to the community is clear.

### Conclusion

■ {36} We are compelled by our precedent and the policy behind the doctrine of strict liability for abnormally dangerous activities to hold that the repair of propane trucks is not an ultrahazardous activity in New Mexico.

### II. Application of NFPA 58 to Plaintiffs

{37} The second issue on appeal is whether the trial court erred by instructing the jury that NFPA 58 applied to "any person or company," which included Plaintiffs or their employer. At trial, Plaintiffs tendered two negligence per se instructions relating to an asserted violation of the Albuquerque Fire Code, § 14–2–1(B)(3) and NFPA 58, § 6–6.2.3 by "defendant" AAA Gas. Modifying Plaintiffs' instructions, the trial court created one instruction, added another section of NFPA § 6–6.2.2 and made the instruction applicable to "any person or company" to whom the law could apply. The instruction as given to the jury read as follows:

> There was an ordinance in force in the city of Albuquerque, at the time of the occurrence in question, which provided as follows:
>
> > For the purpose of prescribing minimum standards regulating conditions hazardous to life and property from fire and explosion within the city, the following code is adopted:
>
> *The N.F.P.A. Fire Codes and Supplements*
> . . .
>
> Additionally there were two New Mexico statutes in force adopting the N.F.P.A. Code and supplements. These provisions of the N.F.P.A. Code state:
>
> > 6–6.2.2 Vehicles parked indoors shall comply with the following:

(a) Cargo vehicles parked in any public garage or building shall have LP–Gas liquid removed from the cargo container, piping, pump, meter, hoses, and related equipment, and the pressure in the delivery hoses, and related equipment shall be reduced to approximately atmospheric, and all valves shall be closed before the vehicle is moved indoors. Delivery hose or valve shall be plugged or capped before the vehicle is moved indoors.

(b) Vehicles used to carry portable containers shall not be moved into any public garage or building for parking until all portable containers have been removed from the vehicle.

(c) Vehicles carrying or containing LP–Gas shall be permitted to be parked in buildings complying with Chapter 7 and located on premises owned or under the control of the operator of such vehicles, provided:

1. The public is excluded from such buildings.

2. There is adequate floor level ventilation in all parts of the building where such vehicles are parked.

3. Leaks in the vehicle LP–Gas systems are repaired before the vehicle is moved indoors.

4. Primary shutoff valves on cargo tanks and other LP–Gas containers on the vehicle (except propulsion engine fuel containers) are closed and delivery hose outlets plugged or capped to contain system pressure before the vehicle is moved indoors. Primary shutoff valves on LP–Gas propulsion engine fuel containers shall be closed while the vehicle is parked.

5. No LP–Gas container is located near a source of heat or within the direct path of hot air being blown from blower-type heater.

6. LP–Gas containers are gauged or weighed to determine that they are not filled beyond the maximum filling limit according to Section 4–4.

6–6.2.3 Vehicles shall be permitted to be serviced or repaired indoors as follows:

(a) when it is necessary to move a vehicle into any building located on premises owned or operated by the operator of such vehicle for service on engine or chassis, the provisions of 6–6.2.2(a) or (c) shall apply.

(b) When it is necessary to move a vehicle carrying or containing LP–Gas into any public garage or repair facility for service on the engine or chassis, the provisions of 6–6.2.2(a) or (b) shall apply, unless the driver or a qualified representative of an LP–Gas operator is in attendance at all times while the vehicle is indoors. In this case, the following provisions shall apply under the supervision of such qualified persons:

1. Leaks in the vehicle LP–Gas system shall be repaired before the vehicle is moved indoors.

2. Primary shutoff valves on cargo tanks, portable containers, and other LP–Gas containers installed on the vehicle (except propulsion engine fuel containers) shall be closed. LP–Gas liquid shall be removed form [sic] the piping, pump, meter, delivery hose, and related equipment and the pressure therein reduced to approximately atmospheric before the vehicle is moved inside. Delivery hose or valve outlets shall be plugged or capped before the vehicle is moved indoors.

3. No container shall be located near a source of heat or within the direct path of hot air blown from a blower or from a blower-type heater.

4. LP–Gas containers shall be gauged or weighed to determine that they are not filled beyond the

maximum filling capacity according to Section 4.4.

(c) If repair work or servicing is to be performed on a cargo tank system, all LP-gas shall be removed from the cargo tank and piping, and the system shall be thoroughly purged before the vehicle is moved indoors.

If you find from the evidence that any person or company violated this ordinance, then you are instructed that such conduct constituted negligence as a matter of law.

{38} Plaintiffs' position is that the NFPA standard does not apply to them as a matter of law, so that allowing the jury to consider Plaintiffs' alleged violation of it was improper and prejudicial. According to Plaintiffs, the jury was misled and confused by the testimony about their alleged violation of the standard. Plaintiffs' argument in support of their position is twofold. First, Plaintiffs were not required to be licensed under NFPA 58. Since they were not tested on the handling, transfer, and storage of propane, they were less knowledgeable about the safe handling of propane than AAA Gas which was required to be licensed. Second, Plaintiffs argue that the standard applies to persons and companies in the propane industry who regularly handle, transfer, and store propane, not incidental users of propane in the performance of job requirements. Plaintiffs point to the scope and application sections of each of the eleven chapters of NFPA 58, as well as Section 1–5, entitled "Qualification of Personnel," and a portion of the commentary contained in the handbook and attached to Plaintiffs' brief-in-chief as an appendix. Defendants correctly note that except for §§ 6–6.2.2 and 6–6.2.3, the NFPA material provided by Plaintiffs were not part of the record. However, we do not rely on those materials in reaching our decision.

{39} AAA Gas counters that the Albuquerque Fire Code incorporated NFPA 58, making the regulation applicable to Plaintiffs. Moreover, it argues, NFPA 58 applies to Plaintiffs on its face: Section 6–6.2.2(a) prohibits "[c]argo vehicles [from being] parked in any public garage or building [without first removing propane] from the cargo container, piping, pump, meter, hoses, and related equipment . . . ." And Section 6–6.2.3 specifically addresses repair and servicing of the cargo tank system indoors, prohibiting such activity unless the tank has been emptied and purged of propane. Plaintiffs violated these rules when they parked the truck in the garage and began to service the truck without first assuring all of the propane was removed. Both Defendants argue that the jury had sufficient evidence to find NFPA 58 applied to Plaintiffs.

### Preservation

{40} We briefly address preservation. Plaintiffs claim they have preserved this matter by their tender of two instructions and their general pre-trial objections to the opinion testimony of witnesses regarding the applicability of NFPA 58 to Plaintiffs or their employer. Subject to certain exceptions, Rule 12–216(A) NMRA 2003 requires that the record reflect that a ruling by the trial court was fairly invoked. "The principal purpose of the rule . . . is to alert the mind of the trial judge to the claimed error and to accord the trial court an opportunity to correct the matter." *Madrid v. Roybal,* 112 N.M. 354, 356, 815 P.2d 650, 652 (Ct.App. 1991). The tender but refusal of an instruction is generally sufficient to preserve error. *See, e.g., State v. Sarracino,* 1998–NMSC–022, ¶¶ 8, 11, 125 N.M. 511, 964 P.2d 72; *State v. Montano,* 83 N.M. 523, 524, 494 P.2d 185, 186 (Ct.App.1972); *State v. Gonzales,* 82 N.M. 388, 392, 482 P.2d 252, 256 (Ct.App. 1971). However, where one instruction is given rather than another, the party must draw the court's attention to the specific defect in the given instruction to preserve it for appellate review. *Sonntag v. Shaw,* 2001–NMSC–015, ¶ 17, 130 N.M. 238, 22 P.3d 1188; *Lewis v. Rodriguez,* 107 N.M. 430, 435, 759 P.2d 1012, 1017 (Ct.App.1988).

{41} From all appearances, the trial court did not refuse Plaintiffs' tendered instruction. Rather the trial court modified Plaintiffs' and Defendants' instructions by adding Section 6–6.2.2 and changing "if you find . . . *defendant* violated this ordinance

...." to "if you find ... *any person or entity* violated this ordinance...." The court gave one instruction, rather than another. Plaintiffs should have alerted the trial court, on the record, of their objections to the instruction given. We have not found any objection in the record to the instruction given. Rather, it appears the instructions were informally settled off the record. Although the parties were later given an opportunity to make formal objections on the record and Plaintiffs objected to other instructions, they did not specifically object to the "fatal" instruction, much less point out the defect it now argues. As a result, we are deprived of the court's rationale for instructing the jury that the regulation could apply to "any party or company."

{42} On the other hand, we note that neither Defendant has raised this issue. Moreover, the trial court indicated that the "tendered instructions [that were not given were] specifically rejected in spite of [Plaintiffs'] arguments to the contrary that sufficient evidence or the state of the law warrant[ed] the giving of said instructions." In light of these circumstances, and Plaintiffs' general pre-trial objections, we believe the trial court was alerted to Plaintiffs' position. We wish to point out, however, that the question of whether Plaintiffs preserved this matter is a close call. We believe it was barely adequate. We caution parties in the future to clearly specify their objections to a given instruction on the record to preserve the matter for appellate review.

### Applicability of NFPA 58

{43} Our Supreme Court has adopted the following test to determine whether a negligence per se instruction is appropriate:

(1) [T]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant [or plaintiff] must violate the statute,[2] (3) the plaintiff must be in the class of persons sought to be

protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.

*Archibeque v. Homrich*, 88 N.M. 527, 532, 543 P.2d 820, 825 (1975). Plaintiffs' argument is essentially that the negligence per se instruction fails the first and second prong of this test because the regulation was not applicable to them. We must determine whether the NFPA 58 standard applied to Plaintiffs as a matter of state or municipal law. Questions of law are reviewed de novo. *See Davis v. Bd. of County Comm'rs*, 1999–NMCA–110, ¶ 11, 127 N.M. 785, 987 P.2d 1172 (ruling the existence of a legal duty is a question of law); *see also Acosta v. City of Santa Fe*, 2000–NMCA–092, ¶ 16, 129 N.M. 632, 11 P.3d 596 (interpreting ordinance to determine if legal duty exists is a question of law); *Gabaldon v. Erisa Mortgage Co.*, 1997–NMCA–120, ¶ 6, 124 N.M. 296, 949 P.2d 1193, *rev'd in part on other grounds by* 1999–NMSC–039, ¶ 7, 128 N.M. 84, 990 P.2d 197 (reviewing courts apply de novo standard to determine questions of law).

{44} The LPG & CNG Act regulates the repair of vehicles used to deliver propane gas in compliance with NFPA standards. *Id.* §§ 70–5–3 and –4. A preliminary review of the NFPA 58 materials provided by Plaintiffs suggests the standard is applicable to the propane industry such as AAA Gas, rather than incidental handlers such as Plaintiffs. Plaintiffs also cite *Trinity Universal Ins. Co. v. Streza*, 8 P.3d 613, 617 (Colo.Ct.App.2000) which held incidental users of propane were outside the scope of NFPA 58. The *Trinity* court's conclusion that NFPA 58 did not apply to incidental users of propane was based on expert opinion and a finding that defendant was not within the scope of a state statute adopting the NFPA 58. *Id.* at 616.

{45} Plaintiffs argue that, like the defendant in *Trinity*, they are "incidental users" of propane and are not within the scope of our LPG & CNG Act. However, unlike *Trinity*, this Court has already held

---

**2.** While most negligence per se claims are against defendants, plaintiffs can be found comparatively at fault on an instruction of negligence per se. *See, e.g., Olguin v. Thygesen*, 47 N.M. 377, 387–88, 143 P.2d 585, 592 (1943); *Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 625–26, 698 P.2d 887, 898–99 (Ct.App.1985).

that the state standards apply to members of the general public. *Jaramillo v. Fisher Controls Co.*, 102 N.M. 614, 620, 698 P.2d 887, 893 (Ct.App.1985) (finding LPG Bureau, which adopted NFPA 58, imposed a standard and a duty to comply with the standard on plaintiff who purchased a propane regulator to test his home stove). "Legislatively authorized rules and regulations have the force of law," and the "[v]iolation of a properly adopted and filed rule or regulation is negligence per se." *Id.* at 619, 698 P.2d at 892; *accord Brininstool v. N.M. State Bd. of Educ.*, 81 N.M. 319, 322, 466 P.2d 885, 888 (Ct.App.1970); *see also F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1223 (10th Cir.2000) (interpreting New Mexico law). Here there is no argument presented to suggest the regulation was not properly adopted and filed. We hold that pursuant to *Jaramillo*, the LPG & CNG Act created a legal duty in Plaintiffs to adhere to NFPA 58. As such, the trial court did not err in instructing the jury that the standard applied to Plaintiffs as a matter of state law.

■ {46} We are not persuaded Plaintiffs can escape the Albuquerque Fire Code, which served as the basis for the court's instruction on negligence per se. At the time of the explosion, the City of Albuquerque had a fire code in effect which adopted NFPA 58. Section 14–2–1(A)(3) (1994).[3] Specifically, Section 14–2–1 reads as follows:

(A) For the purpose of prescribing *minimum standards* regulating conditions hazardous to life and property from fire and explosion within the city, the following code is adopted.

(B) The following documents, as amended in § 14-2-2, are adopted as the Fire Code of the city, and from the date on which this article takes effect, *shall be controlling within the boundaries of the city:*

. . . .

(3) The *N.F.P.A. Fire Codes and Supplements*, as published by the National Fire Protection Association as a reference, except N.F.P.A. 101 will be adopted *as it applies to existing buildings* built prior to January 5, 1989. ('74 Code, § 7–27–1A) (Ord.22–1993).

(emphasis added). We are not aware of any cases that determine whether the Albuquerque Fire Code applies to Plaintiffs as Defendants contend. We, therefore, construe the ordinance as a matter of first impression. The same guides for construction used in interpreting statutes apply to construing an ordinance. *Acosta*, 2000–NMCA–092, ¶ 17, 129 N.M. 632, 11 P.3d 596. "[W]e must interpret the ordinance to mean what the City intended it to mean and to accomplish the ends sought to be accomplished." *Id.* The stated purpose of the Albuquerque Fire Code is to impose "minimum standards [to regulate] conditions [that create a risk] to life or property from fire and explosion within the city." Section 14–2–1(A). To accomplish this goal, the city adopted the NFPA 58 as it applies to all "existing buildings." Section 6–6.2.2(a) expressly prohibits the parking of a loaded propane truck in *any* public garage or building. Section 6–6.2.3(c) expressly prohibits repairing a loaded propane truck indoors.

---

**3.** Only portions of Section 14–2–1(A)(3) of the Albuquerque City Fire Code were pled below. The Code in its entirety was not made part of the record. While a line of cases prohibits this Court from taking judicial notice of an ordinance that is not part of the record, *see Coe v. City of Albuquerque*, 81 N.M. 361, 364, 467 P.2d 27, 30 (1970); *Gen. Servs. Corp. v. Bd. of Comm'rs*, 75 N.M. 550, 552, 408 P.2d 51, 52 (1965); *City of Albuquerque v. Leatherman*, 74 N.M. 780, 782, 399 P.2d 108, 110 (1965); *Baptiste v. City of Las Cruces*, 115 N.M. 178, 179 n. 1, 848 P.2d 1105, 1106 n. 1 (Ct.App.1993), we have found no sound reason to deny an appellate court access to the law when it is reviewing a case de novo. This Court must make its own independent finding of the law and in doing so, must have latitude in

reviewing the applicable law in its entirety to determine whether the jury instructions fairly represent the law. Norman J. Singer, *Sutherland Statutory Construction*, § 38:1 (6th ed. 2001) ("Concerning questions of law, a judge is permitted to make use of any information which may come to his attention, whether it has been made a matter of record in the case or not."). Under the circumstances of the instant case, we find this Court may review the ordinance in its entirety because the existence of the Code was admitted by all parties and the relevant portions were pled in part out of context. *See Srader v. Pecos Constr. Co.*, 71 N.M. 320, 322–25, 378 P.2d 364, 365–68 (1963); *cf McKeough v. Ryan*, 79 N.M. 520, 521, 445 P.2d 585, 586 (1968).

{47} The plain language of the statute does not exempt repair shops or their employees from the Albuquerque Fire Code, nor does it limit the effect of its reach to persons or businesses in the "propane industry." Rather, the Albuquerque Fire Code applies generally to all existing buildings in Albuquerque. "[O]rdinances enacted under the police power of a municipality for the protection of the public health and safety, . . . should be liberally construed." *Srader v. Pecos Constr. Co.*, 71 N.M. 320, 325, 378 P.2d 364, 367–68 (1963). Reading the statute in light of its intended purpose and as a whole, we find Plaintiffs were subject to the Albuquerque Fire Code, including NFPA 58.

{48} Rules and regulations adopted by city ordinance have the force of law. *City of Albuquerque v. Ryon*, 106 N.M. 600, 602, 747 P.2d 246, 248 (1987). Having the force of law, municipal rules and regulations impose a standard and a duty to comply with that standard. Noncompliance is not excused by ignorance of the standard, nor is testimony regarding noncompliance inadmissible. *Jaramillo*, 102 N.M. at 620, 698 P.2d at 893.

{49} There is no dispute that the city adopted NFPA 58 in its Albuquerque Fire Code and there is no challenge to the validity of that ordinance. The ordinance applied to Plaintiffs and their employer Cañada. It imposed standards and a legal duty to comply with the standards on Plaintiffs. The fact that Plaintiffs were not licensed and pleaded ignorance of the rules and regulations does not excuse noncompliance with the standard. This is so, especially in light of the fact that the record shows Cañada was certified by the LP Gas Bureau to work on propane trucks, held itself out as proficient in this line of work, and its mechanics were experienced in the repair of propane trucks.

{50} In light of the foregoing, we hold the jury instruction on Plaintiffs' negligence per se was proper as a matter of law. It follows that the admission of evidence of Plaintiffs' violation was relevant and, if otherwise proper, not error. *See Jaramillo*, 102 N.M. at 620, 698 P.2d at 893.

## III. OSHA Statement

{51} Following the explosion at Cañada on July 29, 1997, Velasquez was admitted to the University of New Mexico Burn Center in Albuquerque. Five hours prior to his discharge on July 31, an OSHA investigator conducted an interview of Velasquez. The interview began at 11:00 a.m., and a one and one-half page statement was prepared by the investigator which Velasquez subsequently signed. A second interview resumed at noon the same day and, at its conclusion, Velasquez signed a two and one-half page statement prepared by the investigator. According to Plaintiffs, the pertinent and damaging statements attributed to Velasquez were as follows:

> (1) he and Joe Salazar were helping diagnos[e] the truck through procedures . . . on the back of the truck & there was no flow coming out; (2) Joseph had the bypass hose hooked up off the back into the tank to see if it would pump . . .; and (3) when we got the truck from AAA, they said they had just put some fuel in there, but I didn't know how much. (Internal quotation marks omitted.)

{52} Plaintiffs challenge the admission of these statements on three grounds: (1) the statement is prohibited by NMSA 1978, § 41–1–1 (1971); (2) the statement was not properly authenticated; and (3) as a result of medication and post traumatic shock, Velasquez was incompetent to give the statement at the time it was taken, making the statement unreliable.

**Admissibility Under Section 41–1–1 (Release Act)**

{53} The Release Act governs settlements, releases, and statements of injured patients. The Act excludes from evidence any statement for "use in negotiating a settlement or obtaining a release" taken by a "person whose interest is or may become adverse" to an injured patient during the patient's first fifteen days of confinement in a hospital, if it is disavowed fifteen days after discharge or not acknowledged before a notary. Section 41–1–1(A)(3). The provisions of the Act do not apply if the injured party prepares a written, notarized acknowledg-

ment of his or her willingness to give the statement at least five days before the statement is taken. NMSA 1978, Section 41–1–2 (1971)

{54} Although the statement was taken by OSHA, a government agency and a nonparty to the suit, Plaintiffs argue OSHA was a potentially "adverse party" within the meaning of the statute, because the OSHA report blamed Cañada employees for the explosion. The trial court, however, found that OSHA was not an adverse party and that the statute was not applicable.

{55} We agree under the facts of this case that the statute is not applicable. On its face, the Release Act pertains only to adverse or potentially adverse parties and prevents those parties from obtaining statements from injured patients for the purpose of settlement or release. "[T]he statute was enacted to prevent injustice to [the insured by an insurer] while he is hospitalized or under the care of a doctor." *Mitschelen v. State Farm Mut. Auto. Ins. Co.*, 89 N.M. 586, 589, 555 P.2d 707, 710 (Ct.App.1976); *Ponce v. Butts*, 104 N.M. 280, 283, 720 P.2d 315, 318 (Ct.App.1986) ("The Act requires fair and impartial conduct by the insurer.").

{56} Unlike an insurance investigator who may be profit motivated, an OSHA compliance officer conducting a routine interview in the normal course of business is not an adverse party within the meaning of the statute. The stated purpose of OSHA is "to assure every employee safe and healthful working conditions' at least in part by 'the effective enforcement of the health and safety regulations.'" NMSA 1978, § 50–9–2(B) (1993). Specifically, the Act requires every employer to furnish a workplace free from hazards that cause or are likely to cause death or serious physical harm to its employees. NMSA 1978, § 50–9–5(A) (1975). To accomplish this goal, OSHA officers are authorized to question employees. NMSA 1978, § 50–9–10(A)(2) (1993). Moreover, the OSHA officer in this case was not interested in seeking a settlement or negotiating a release from the employee, even if the statement subsequently resulted in the issuance of a citation to the employer. Therefore, the subject matter of the statute, preventing ad-

verse parties from securing the release or settlement of claims, was not an issue when the OSHA officer conducted the interviews.

## Authentication

{57} Plaintiffs next contend that the statements were never authenticated and the failure of Defendants to call the OSHA investigator to authenticate the statements deprived them of their right to cross examine the interviewer regarding their accuracy. Although Plaintiffs stipulated to the authenticity of the OSHA file that contained the statements as part of OSHA's investigative report, they raise several points of concern regarding the statements. First and foremost, there was confusion as to the investigator's identity. AAA Gas filed two affidavits from two different investigators, both swearing that they took the statement and attesting to Velasquez's competence; however, it appears that all parties agree that only one investigator interviewed Velasquez. Second, Velasquez and the investigator were the only persons present during the interview, which was not recorded. Velasquez did not write the statement and, by the time of trial, Velasquez's memory of the interviews was vague. As a result, Plaintiffs argue, there is no foundation for the statement unless the investigators testified about who actually took the statement and affirmed that it was an accurate representation of what was said. Defendants counter that the failure to object to the OSHA file resulted in a waiver of any objection to the authenticity of the statements contained in the file. *State v. Gallegos*, 92 N.M. 336, 337–38, 587 P.2d 1347, 1348–49 (Ct.App.1978) (finding that absent timely objections or a motion to strike, objections to foundational requirements are not reviewed on appeal).

{58} The record clearly shows Plaintiffs made several objections to the authenticity of the statements, as well as a motion to strike at the conclusion of trial. On appeal, Plaintiffs cite only the general proposition that the proponent of documents, including public records, has the burden to authenticate those records. *State v. Ramirez*, 89 N.M. 635, 645–46, 556 P.2d 43, 53–54 (Ct.App.1976), *overruled on other grounds by Sells v. State*,

98 N.M. 786, 788, 653 P.2d 162, 164 (1982). This ignores the fact that Plaintiffs stipulated to the file's authenticity. They cite no authority to support their position that each document within a file must be separately authenticated. More important, Plaintiffs do not deny that the statements were taken by an OSHA investigator or that the statements were part of the OSHA file. Rule 11–901(A) NMRA 2003 merely requires "sufficient evidence to support a finding that the matter in question is what its proponent claims," which is a preliminary determination made by the trial judge. *State v. Garcia*, 110 N.M. 419, 425, 796 P.2d 1115, 1121 (Ct.App.1990). In this case, Plaintiffs do not really contest the underlying facts for the trial court's preliminary determination, and we therefore affirm on the issue of authenticity under Rule 11–901. Along with their general arguments about authenticity, Plaintiffs specifically argue that the author of the report was not established. To the extent that this raises foundational arguments distinct from authenticity, Rule 11–104 NMRA 2003 may apply. However, Plaintiffs fail to establish that the relevancy of the report was conditioned on the identity of the author. Rule 11–104(B). *Cf. Plummer v. Devore*, 114 N.M. 243, 245–46, 836 P.2d 1264, 1266–67 (Ct.App.1992) (holding that foundation was not established for admission of breathalyzer test where State failed to show that machine was capable of producing valid results). Accordingly, the trial court did not abuse its discretion, and Plaintiffs arguments fail.

{59} Plaintiffs' fundamental problem is that the *contents of the statements* cannot be verified, not that the statements themselves were not authenticated. Their objections on appeal go to the reliability and trustworthiness of these statements. The record reflects, however, that the trial court overruled all of Plaintiffs' objections by finding that the entire OSHA report was admissible as a public report under Rule 11–803(H) NMRA 2003. The trial court did not abuse its discretion in finding the report sufficiently trustworthy for the jury to consider. *See Cent. Sec. & Alarm Co. v. Mehler*, 1996–NMCA–060, ¶ 31, 121 N.M. 840, 918 P.2d 1340 (applying abuse of discretion standard to affirm trial court's decision to admit ledger book under business records exception). The question of a document's accuracy goes to the weight of the evidence, not its admissibility. *Id.* ¶ 30; *see also Crabtree v. Measday*, 85 N.M. 20, 23, 508 P.2d 1317, 1320 (Ct.App.1973) (stipulating to report did not estop plaintiff from explaining or denying validity or accuracy of it). Once Plaintiff waived any foundational objections to the authenticity of the OSHA file, the court correctly ruled Plaintiff could attack the validity and accuracy of the statements during cross examination or through other witnesses. Plaintiffs vigorously attacked the validity and accuracy of the statement in its examination of Velasquez and his wife. They waived the opportunity to attack the credibility of the investigators by failing to subpoena those witnesses. They cannot now complain they were prejudiced.

### Competency

{60} Plaintiffs' final challenge is that the statements should have been excluded because Velasquez's heavily medicated state at the hospital rendered him incompetent at the time he gave the statement. Preliminary questions of fact concerning the competency of a witness are determined by the court. *See* Rule 11–104(A); *Huff v. White Motor Corp.*, 609 F.2d 286, 293–94 (7th Cir.1979); *see also State v. Hueglin*, 2000–NMCA–106, ¶¶ 11, 21–22, 130 N.M. 54, 16 P.3d 1113 (limiting trial court's role to insuring witness meets minimum standard of competency under Rule 11–601 NMRA 2003). Trial courts have broad discretion to determine the competency of a witness, and that determination will be reversed only upon a showing that the court abused its discretion. *See City of Santa Fe v. Komis*, 114 N.M. 659, 663, 845 P.2d 753, 757 (1992) (vesting court with broad discretion to admit or exclude evidence); *State v. Macias*, 110 N.M. 246, 249, 794 P.2d 389, 392 (Ct.App.1990) An abuse of discretion occurs where the court's ruling is "clearly against the logic and effect of the facts and circumstances before the court." *Komis*, 114 N.M. at 663, 845 P.2d at 757. Where the court's discretion is fact-based, we must "look at the facts relied on by the trial court as a basis for the exercise of

its discretion, to determine if these facts are supported by substantial evidence." *Lopez v. Wal–Mart Stores, Inc.,* 108 N.M. 259, 260, 771 P.2d 192, 193 (Ct.App.1989). "[I]f the facts essential to the trial court's judgment are not established by substantial evidence in the record, we will necessarily find an abuse of discretion." *Id.* at 261, 771 P.2d at 194; *see also Baum v. Orosco,* 106 N.M. 265, 269, 742 P.2d 1, 5 (Ct.App.1987) (holding that trial court resolves contested factual issues about whether to admit evidence and no abuse occurs when there is substantial evidence to support that decision).

{61} Plaintiffs' reply brief misstates the applicable standard as a question of law. However, the case cited, *Dick v. City of Portales,* 118 N.M. 541, 883 P.2d 127 (1994), is not applicable to the question of a witness's competency. *Dick* discusses the question of "competent evidence," which is any evidence that is admissible to prove a relevant fact. *Id.* at 544, 883 P.2d at 130. Relevancy is not at issue here.

▮▮▮▮ {62} Under Rule 11–601, a witness is presumed competent to testify. *See Hueglin,* 2000–NMCA–106, ¶ 22, 130 N.M. 54, 16 P.3d 1113. Ordinarily the party challenging competency bears the burden to show the witness is incompetent. *State v. Manlove,* 79 N.M. 189, 190, 441 P.2d 229, 230 (Ct.App.1968). We have held that a determination of competency requires the trial court to inquire into the witness's capacities to observe, recollect, and communicate, as well as appreciate a duty to speak the truth at the meaningful time. *Macias,* 110 N.M. at 249–50, 794 P.2d at 392–93. More recently, however, this Court has recognized that "[t]he Rule represents the culmination of the trend that has converted questions of competency into questions of credibility." *Hueglin,* 2000–NMCA–106, ¶ 22, 130 N.M. 54, 16 P.3d 1113 (quoting 3 *Weinstein's Federal Evidence* § 601.02[1]) (2d ed.) (internal quotation marks omitted). Thus, the trial court ensures that witnesses meet a minimum standard of competency, and the jury resolves questions of the weight and credibility of the testimony. *Id.* A minimum standard of competency merely requires that a reasonable person could "put any credence in [the]

testimony." *Id.* (quoting 3 *Weinstein's, supra* §§ 601.01[2] and 601.03[1][a]) (internal quotation marks and citations omitted).

{63} The trial court held a preliminary hearing to determine whether Velasquez was competent when he gave the statements. At the conclusion of the evidence, the trial court ruled that Velasquez's degree of competency at the time of his statement went to weight rather than admissibility. The trial court was "unmoved by the arguments in favor of denying the admissibility." While the trial court did not express its reasons for the ruling, which would have assisted our review of its exercise of discretion, we find that the court's ruling was supported by substantial evidence and, as such, not against the logic and effect of the facts and circumstances before the court. Thus, we find no abuse of discretion.

{64} The treating physician, Dr. Demarest, testified from the nurse's notes that the day after the accident and the day before the interview, Velasquez was "awake, social and friendly" at the hospital. Velasquez was taking Percocet and large doses of morphine for his pain throughout the course of his hospitalization; he took two tablets of Percocet at 1:00 a.m., ten hours before the interview, and sixteen milligrams of morphine at 5:30 a.m., five and one-half hours before the interview. The interview was conducted in two parts between 11:00 a.m. and 1:00 p.m. Just after the interview Velasquez was sitting up in his bed and eating lunch with no complaints of pain, although he conversed with the nurse who noted he was upset about the OSHA statements. Prior to his discharge, an occupational therapist noted Velasquez was "oriented times three," meaning he knew who he was, where he was, and what time it was. The therapist also noted Velasquez was a "good historian." Dr. Demarest opined that the therapist would have noted if Velasquez appeared confused at that time. Three hours after the interview, Velasquez was discharged. At that time, he was "verbalizing and understanding."

{65} While Dr. Demarest testified that the combined effect of the medications could "potentially have a significant effect in terms of judgment, insight and ability to decide....

and recall," he could not conclusively say what effect they had on Velasquez since, in his words, "patients are variable." The fact that evidence does not reflect Velasquez's mental state at the exact time of the interview is not critical. The evidence did describe his condition in the immediate hours before and after the interview. *Cf. Macias,* 110 N.M. at 250, 794 P.2d at 393 (finding videotaped interview taken *nine months* before trial was not an adequate inquiry into the competency elements within the meaningful time).

{66} Plaintiffs argue that their witnesses—Velasquez, his wife and his sister—testified about his mental state closer in time to the event, and their testimony paints a different picture of Velasquez's mental state. However, as the fact finder on this preliminary question, the trial court was not required to accept any of their testimony to the exclusion of other evidence.

{67} Although we do not ignore the strong pain medication Velasquez was taking during the course of his hospitalization or that he was recovering from a traumatic accident, the question before us is whether it was an abuse of discretion for the trial court to conclude that Velasquez met the "minimum standards" of competency. Based on the foregoing evidence, we find it was reasonable for the trial court to conclude Velasquez had the capacity to observe, recollect, and communicate. Plaintiffs never suggested Velasquez did not appreciate the duty to speak the truth. Any confusion Velasquez might have expressed in his recount of the events to the investigator, as well as his medicated state were issues of fact that went to credibility and not admissibility and were properly before the jury.

## IV. Motion to Amend Complaint—Unfair Practices Act

{68} Plaintiffs' fourth issue on appeal is that the trial court erred in denying their motions to amend the complaint. On May 15, 2000, three months after filing the complaint in the first Bernalillo County District Court action, and almost three years after the filing of decedent Salazar's action in Valencia County District Court, Plaintiffs filed a motion to amend their complaint to add a new cause of action that alleged LPGE had violated the UPA. Plaintiffs filed a supplemental motion to amend on May 22, 2000. After hearing arguments on June 6, 2000, the court denied Plaintiffs' motions on the basis of unfair prejudice. The court explained that Plaintiffs should have anticipated the theory earlier on, the facts were not new, and an amendment would delay the trial two years due to the prospect of additional discovery and joining third parties which LPGE would need to defend against the claim. Plaintiffs renewed their motion at the end of trial pursuant to Rule 1–015(B) NMRA 2003 to amend the complaint to conform to the evidence presented at trial by adding the UPA claim, as well as a new intentional misrepresentation claim. This motion also was denied. Meanwhile, Plaintiffs filed a second complaint against LPGE, which alleged both UPA and misrepresentation claims. *Apodaca v. LP Gas Equip., Inc.,* No. CV–2000–6621 (Bernalillo County District Court June 28, 2000).

{69} Plaintiffs protest that the court abused its discretion under Rule 1–015(A) and (B) by denying the amendments. Defendant LPGE counters that the denial was proper because the amendments were: (1) untimely and (2) legally insufficient because the UPA does not provide a remedy for personal injuries. *See Viernow v. Euripides Dev. Corp.,* 157 F.3d 785, 799 (10th Cir.1998) (noting untimeliness alone is sufficient reason to deny leave to amend); *see also State v. Elec. City Supply Co.,* 74 N.M. 295, 299, 393 P.2d 325, 328 (1964) (stating the court may deny motion to amend when insufficiency or futility of the motion is apparent on its face). We agree that denying the motion as untimely was not an abuse of discretion. We do not decide whether the UPA provides a remedy for personal injury claims.

### Rules 1–015(A) and (B)

{70} Under Rule 1–015(A), once an answer has been filed, the decision to allow an amended complaint rests solely within the sound discretion of the trial court. *Schmitz v. Smentowski,* 109 N.M. 386, 390, 785 P.2d 726, 730 (1990); *Vernon Co. v. Reed,* 78 N.M.

554, 555, 434 P.2d 376, 377 (1967). Although the Rule expressly states that amendments should be given liberally, the "den[ial of] permission to amend is subject to review only for a clear abuse of discretion." *Id.; Schmitz,* 109 N.M. at 390, 785 P.2d at 730. "[A]n abuse of discretion is said to occur when the court exceeds the bounds of reason, all the circumstances before it being considered." *Clancy v. Gooding,* 98 N.M. 252, 255, 647 P.2d 885, 888 (Ct.App.1982) (internal quotation marks omitted) (quoting *Acme Cigarette Servs., Inc. v. Gallegos,* 91 N.M. 577, 577 P.2d 885 (Ct.App.1978)).

{71} The court ruled, without elaboration, that an amendment would prejudice the parties because it would cause an estimated two year delay in the resolution of the case. Considering the facts and circumstances before the court, we conclude that the decision was not unreasonable.

{72} The explosion occurred in July 1997, over three years before the scheduled trial date. While Plaintiffs officially intervened eighteen months after the Valencia County complaint was filed, the court was presented with evidence at the hearing that Plaintiffs' counsel were actually involved in representing their clients less than two weeks after the explosion. After Plaintiffs intervened, the Valencia trial was continued at least three times. During argument on the Rule 1–015(A) motion, Plaintiffs' counsel admitted to the court that the facts underlying the motion to amend were always there—Plaintiffs were just "bundling them in a different theory." The three year delay in getting the case to trial combined with the arguments suggesting LPGE would need a continuance to assess its position, develop facts and a defense, and determine what claims could be asserted by way of a third-party complaint against Fisher Controls, as well as the prospective burden of additional costs and expenses to the parties, were proper reasons to deny the motion to amend. Accordingly, we hold that the court did not abuse its discretion in denying Plaintiffs leave to amend under Rule 1–015(A).

{73} We also find that the court did not abuse its discretion under Rule 1–015(B). Rule 1–015(B) allows "[a]mendments to conform the pleadings to the evidence … when the issues are tried by the express or implied consent of the parties." *Schmitz,* 109 N.M. at 390, 785 P.2d at 730. Implied consent to a new theory is generally absent when the evidence is relevant to other pleaded issues. *Id.; Wynne v. Pino,* 78 N.M. 520, 523, 433 P.2d 499, 502 (1967). Nonetheless, "[e]ven if the party has not consented to amendment, a trial court is required to allow it freely *if the objecting party fails to show he will be prejudiced thereby.*" *Schmitz,* 109 N.M. at 390, 785 P.2d at 730 (emphasis added). "The test of prejudice is whether the [opposing] party had a fair opportunity to defend and whether [they] could offer additional evidence on the new theory." *Id.* at 391, 785 P.2d at 731; *Wynne,* 78 N.M. at 523, 433 P.2d at 502.

{74} LPGE argues, and the trial court agreed, that LPGE never consented to try the UPA claims. To the contrary, LPGE strenuously objected to trying this claim. The failure to object to the admission of the evidence which would support that claim cannot now be used to show consent since the evidence was relevant to other pleaded issues. Although LPGE clearly did not consent to try the theory, it never argued how it would be prejudiced if the amendment was allowed at that time. Plaintiffs had a duty to raise this issue to alert the trial court, as well as LPGE, of any error in denying the motion, to wit: a granting of the motion would not prejudice LPGE. *Three Rivers Land Co. v. Maddoux,* 98 N.M. 690, 693, 652 P.2d 240, 243 (1982) ("It is the duty of the appellant to see that the record is properly before us. We will not consider matters not contained in the record on appeal.") (citations omitted), *overruled on other grounds by Universal Life Church v. Coxon,* 105 N.M. 57, 728 P.2d 467 (1986); *see also Reeves v. Wimberly,* 107 N.M. 231, 236, 755 P.2d 75, 80 (Ct.App.1988). "Upon a doubtful or deficient record, every presumption is indulged in favor of the correctness and regularity of the trial court's decision, and the appellate court will indulge in reasonable presumptions in support of the order entered." *Id.*

{75} The court's acknowledgment that the issue had been thoroughly briefed and

argued pretrial suggests LPGE's pretrial position—that LPGE would need to do additional discovery to defend the claims and possibly add a third-party defendant—was the same at the end of the trial. Under these facts, there would have been a showing of prejudice: lack of an opportunity to defend and offer of additional evidence. We find the trial court did not abuse its discretion in denying Plaintiffs' Rule 1–015(B) motion.

### Res Judicata and Collateral Estoppel

{76} Plaintiffs appeal from the dismissal of their second complaint on res judicata and collateral estoppel grounds because they were denied a full and fair opportunity to litigate the issues in the first action when the trial court denied their motions to amend their claims against LPGE. A decision to grant summary judgment on preclusion principles is reviewed under a de novo standard. *Wolford v. Lasater,* 1999–NMCA–024, ¶ 4, 126 N.M. 614, 973 P.2d 866; *Anaya v. City of Albuquerque,* 1996–NMCA–092, ¶ 5, 122 N.M. 326, 924 P.2d 735.

{77} Four elements must be present for res judicata to apply: "(1) the same parties or parties in privity; (2) the identity of capacity or character of persons for or against whom the claim is made; (3) the same subject matter; and (4) the same cause of action in both suits." *Anaya,* 1996–NMCA–092, ¶ 6, 122 N.M. 326, 924 P.2d 735; *see also Wolford,* 1999–NMCA–024, ¶ 5, 126 N.M. 614, 973 P.2d 866 (same); *Three Rivers Land Co.,* 98 N.M. at 694, 652 P.2d at 244. The only disputed element in this case is whether the cause of action is the same. Plaintiffs argue that the initial lawsuit determined Defendant LPGE liability under negligence or products liability rather than its liability under the common law or the UPA for misrepresentations made regarding the valve. In Plaintiffs' view, these are separate and distinct claims.

{78} New Mexico has adopted the "transactional analysis" under the Restatement (Second) of Judgments Sections 24 and 25 (1982) (hereinafter Restatement) to determine what constitutes a cause of action for res judicata purposes. *Anaya,* 1996–

NMCA–092, ¶ 7, 122 N.M. 326, 924 P.2d 735. Under that analysis, res judicata precludes relitigation of any claim that arises out of "all or any part of the transaction, or a series of connected transactions, out of which the action arose." Restatement § 24(1). "What ... constitutes a 'transaction' ... [is] determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.* § 24(2); *Ford v. N.M. Dep't of Pub. Safety,* 119 N.M. 405, 413, 891 P.2d 546, 554 (Ct.App.1994). Under this approach, "a mere change in a legal theory does not create a new cause of action." *Three Rivers Land Co.,* 98 N.M. at 695, 652 P.2d at 245. "This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts, or would call for different measures of liability or different kinds of relief." *Ford,* 119 N.M. at 413, 891 P.2d at 554 (quoting Restatement § 24 cmt. c). Rather, "[t]he transactional test requires us ... to examine the operative facts underlying the claims made in the two lawsuits." *Anaya,* 1996–NMCA–092, ¶ 8, 122 N.M. 326, 924 P.2d 735. To determine whether these facts form a convenient trial unit, we examine the overlap of the witnesses and evidence relevant to the claims in the two lawsuits. *Id.* ¶ 14.

{79} The thrust of both actions against LPGE is that it misrepresented the valve as new when in fact it supplied Cañada with the wrong model valve, that was used and substantially altered, creating a defective condition that ultimately injured Plaintiffs. The facts Plaintiffs would have relied on in the second lawsuit to prove misrepresentation and the UPA violation were the same as the facts relied on in the first lawsuit to prove negligence and products liability. In the first action, the jury was instructed that to find LPGE negligent, Plaintiffs had the burden to prove LPGE did not supply a newly manufactured Fisher Controls valve to Cañada or LPGE did not inspect the valve to verify it was new. To hold LPGE liable

under a products liability theory, the jury had to find LPGE provided a defective product. The jury answered "no" to the question of whether LPGE was negligent and "no" to the question of whether LPGE was liable for products liability. Similarly, Plaintiffs' complaint in the second action alleged Cañada ordered a new valve but LPGE supplied the wrong valve, and the valve supplied was used and altered. It further alleged that LPGE supplied a defective valve because of these conditions. In light of these similarities in fact, as well as proof, we find the claims in both suits were related in time, space, origin, and motivation, and the claims formed a convenient trial unit which provided Plaintiffs with a reason to expect that a verdict in favor of Plaintiffs in the second action would have been precluded by the judgment for LPGE in the first action.

{80} Having found that the requisite elements of res judicata are satisfied, we must now determine whether res judicata bars Plaintiffs' second complaint. Both below and on appeal, Plaintiffs' primary argument is that they were denied a full and fair opportunity to litigate the UPA and misrepresentation claims because the trial court denied their motions to amend in the first action. *See* Restatement § 24 cmt. a (explaining that transactional analysis of a claim "is justified only when the parties have ample procedural means for fully developing the entire transaction in the one action going to the merits to which the plaintiff is ordinarily confined"). As a result, Plaintiffs were unfairly forced to split their cause of action and file the second complaint to avoid the statute of limitations.

{81} This Court has held that full and fair opportunity to litigate is essential to the application of res judicata. *See Moffat v. Branch,* 2002–NMCA–067, ¶ 26, 132 N.M. 412, 49 P.3d 673 (finding full and fair opportunity to litigate is the essence of res judicata); *Ford,* 119 N.M. at 409, 891 P.2d at 550; *Myers v. Olson,* 100 N.M. 745, 747, 676 P.2d 822, 824 (1984). We have also held that Rule 1–015(A), which permits one amendment as of right before a responsive pleading is filed, promotes the policy of providing a full opportunity to litigate all claims in one trial. *Moffat,* 2002–NMCA–067, ¶ 27, 132 N.M. 412, 49

P.3d 673. Rule 1–015(B), permitting amendment to conform to the evidence, gives Plaintiffs another opportunity, so long as there is no prejudice to the Defendant. Because our modern procedural system permits considerable freedom to amend, "[t]he law of res judicata now reflects the expectation that parties who are given the capacity to present their 'entire controversies' shall in fact do so." Restatement § 24 cmt. a.

{82} However, we have also held that res judicata applies not only where a claim was actually litigated in the first action but also where it could have been litigated. *Bank of Santa Fe v. Marcy Plaza Assocs.,* 2002–NMCA–014, ¶ 14, 131 N.M. 537, 40 P.3d 442; *see Wolford,* 1999–NMCA–024, ¶¶ 17–18, 126 N.M. 614, 973 P.2d 866; *Anaya,* 1996–NMCA–092, ¶¶ 7–9, 122 N.M. 326, 924 P.2d 735; *Ford,* 119 N.M. at 414, 891 P.2d at 555. When a plaintiff fails to take advantage of this opportunity in a timely fashion, however, the claim is forever barred. *See Moffat,* 2002–NMCA–067, ¶ 26, 132 N.M. 412, 49 P.3d 673; *See* Restatement (Second) of Judgments § 26 cmt. b (1982). The proper recourse for a plaintiff is to appeal the denial, *Three Rivers Land Co.,* 98 N.M. at 696, 652 P.2d at 246; Restatement § 26 cmt. b, and/or request the court to expressly reserve the plaintiff's right to maintain a second action.

{83} In this case the trial court denied Plaintiffs' amendment because it came too late, and we found no abuse of discretion in the trial court's ruling. Plaintiffs now attempt to avoid the trial court's ruling, which we found proper, by asking this Court to find error in the dismissal of the second complaint because they did not have a full and fair opportunity to litigate the claims in the first action. In essence, Plaintiffs argue they should be allowed to split their claims because the trial court forced that decision on them by denying the amendment. We disagree. The only applicable exception we find to the rule precluding claim splitting is where the court expressly reserves a plaintiff's right to maintain a second action. Restatement § 26(1)(b). We have previously held that "the trial court's refusal to grant leave to amend the complaint is not a reservation by the court." *Three Rivers Land*

*Co.*, 98 N.M. at 696, 652 P.2d at 246 (internal quotation marks omitted). While we have found no New Mexico precedent on point, several federal jurisdictions have held that the "[d]enial of leave to amend does not negate an otherwise valid defense of res judicata, particularly when that denial is premised upon the party's own dilatory conduct." *U.S. Truck Co. v. Nat'l Am. Ins. Co.*, 186 F.Supp.2d 1184, 1190 (W.D.Okla.2002); *accord King v. Hoover Group, Inc.*, 958 F.2d 219, 222–23 (8th Cir.1992); *Johnson v. SCA Disposal Servs., Inc.*, 931 F.2d 970, 975 (1st Cir.1991); *Petromanagement Corp. v. Acme–Thomas Joint Venture*, 835 F.2d 1329, 1334 (10th Cir.1988); *Interstate Pipe Maint., Inc. v. FMC Corp.*, 775 F.2d 1495, 1497–98 (11th Cir.1985) (per curiam); *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 563 (5th Cir.1983); *Poe v. John Deere Co.*, 695 F.2d 1103, 1107 (8th Cir.1982). Federal and New Mexico law rely on the Restatement for guidance in this matter, *see Ford*, 119 N.M. at 413, 891 P.2d at 553, and we agree with those federal courts. Plaintiffs availed themselves of the opportunity to litigate their claims too late in the first action. The denial of leave to amend does not negate an otherwise valid defense of res judicata.

 {84} Plaintiffs invoke a plea for fairness and ask us to make an exception to preclusion principles because of the inflexible approach of the trial court in refusing to allow the amendment. However, mere assertion of error does not compel an exception to the rule precluding claim splitting. *See* Restatement (Second) of Judgments § 28 cmt. j (1982). There must be clear and convincing need of an extraordinary and compelling reason to overcome policies favoring preclusion of a second action. *Id.* § 28(5) & cmt. g. Such instances are the rare exception and typically involve cases where one of the parties conceals material information, labors under some physical or mental disability that impedes effective litigation, or where the different amounts in controversy between the two actions would render preclusion unfair. *Id.* cmt. j. None of these instances is present here and Plaintiffs have not made a sufficient showing of another extraordinary reason to make an exception to preclusion principles.

 {85} We hold that where an appellate court finds the trial court did not abuse its discretion in denying an amendment under Rule 1–015(A) and/or (B) in the first action because the motions were untimely, a plaintiff may not avoid the preclusive effect of the trial court's ruling, absent an express reservation of the plaintiff's right to maintain a second action or another recognized exception. *See* Restatement § 26. Having determined that res judicata applies, we do not consider collateral estoppel. *Jeanes v. Henderson*, 688 S.W.2d 100, 103 (Tex.1985).

## V. Peremptory Challenges

{86} The trial court initially ruled Defendants were each entitled to five peremptory challenges because of their diverse interests but Plaintiffs were only entitled to a total of five even though they sought separate relief. Ultimately, the court allowed five peremptory challenges per family, five to the Apodacas and five to the Velasquezes. Plaintiffs argue that each Plaintiff, Gilbert Apodaca, Barbara Apodaca, Jeffrey Velasquez, and Larissa Velasquez, was entitled to five challenges, for a total of twenty. Plaintiff relies on Rule 1–038(E) NMRA 2003, which states:

> In cases tried before a jury of twelve, each party may challenge five jurors peremptorily. When there are two or more parties defendant, or parties plaintiff, they will exercise their peremptory challenges jointly .... However, *if the relief sought* by or against the parties on the same side of a civil case *differs, or if their interests are diverse, or if cross-claims are to be tried,* the court shall allow each such party on that side of the suit ... five peremptory challenges if the case is to be tried before a jury of twelve.

(Emphasis added.) The Rule sets out three exceptions to the general rule that multiple parties, who are on the same side of the litigation, must exercise peremptory challenges jointly. In particular, Plaintiffs point to the first exception: "if the relief ... differs ... the court shall allow each party ... five peremptory challenges." *Id.* In their view, Plaintiff-wives could have filed their own complaints for loss of consortium, apart from their husbands' claims for negligence

and products liability because loss of consortium is a separate and distinct claim for damages. Plaintiff-wives do not claim to have diverse interests and there were no cross-claims filed.

{87} The only question we consider is whether the wives seek "different relief" from the husbands within the meaning of Rule 1–038(E). Plaintiffs have not cited any case that defines "different relief" under the Rule and this Court has found none. A determination of what is meant by "different relief" in the context of Rule 1–038(E) is a question of law which we review de novo. *In Re Daniel H.*, 2003–NMCA–063, ¶ 8, 133 N.M. 630, 68 P.3d 176.

{88} The rules pertaining to statutory construction apply when a court interprets procedural rules of the Supreme Court. *In re Dominick Q.*, 113 N.M. 353, 354, 826 P.2d 574, 575 (Ct.App.1992). "We read the rule in accordance with its plain meaning. When the language of the Rule is not defined in the Rule, it is given its ordinary meaning. Our role is to discern and give effect to the author's intent." *State v. Eden*, 108 N.M. 737, 741, 779 P.2d 114, 118 (Ct.App.1989) (citation omitted). "This is accomplished by adopting a construction that will not render the Rule's application absurd, unreasonable, or unjust." *In re Dominick Q.*, 113 N.M. at 354, 826 P.2d at 575. Rather, we consider the Rule as a whole, construing each part to achieve a harmonious result. *See Key v. Chrysler Motors Corp.*, 1996–NMSC–038, 121 N.M. 764, 769, 918 P.2d 350, 355.

{89} "Different relief" is not defined in the Rule. Plaintiffs interpret the language to encompass different *claims* for relief, i.e. different causes of action that seek different money damages. We are not persuaded that this is what the drafters intended.

{90} The purpose of peremptory challenges is to "aid each party's interest in a fair and impartial jury." 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 2483 (Supp.2002). Under Rule 1–038(E), "opposing parties" are each given five peremptory challenges. The exceptions to that Rule demonstrate a concern by the drafters that multiple parties on the "same side" may actually be opposing each other. *See Romero v. Felter*, 83 N.M. 736, 738, 497 P.2d 738, 740 (1972) (recognizing "parties" to a lawsuit may be on the same side). Rule 1–038(E) provides the means to determine whether parties on the same side are in fact "opposing parties" by recognizing three situations where the parties are on the same side but in conflict with one another: (1) the relief sought differs, (2) diverse interests, or (3) cross-claims are to be tried. In doing so, the Rule seeks to provide opposing parties on the same side of the litigation the means to a fair and impartial jury. *See Carraro v. Wells Fargo Mortgage & Equity*, 106 N.M. 442, 444, 744 P.2d 915, 917 (Ct.App. 1987) (recognizing Rule 1–038(E) provides additional peremptory challenges to· "diverse parties").

{91} Plaintiffs misapprehend the Rule by equating "different claims" with "different relief." Different relief is not always synonymous with different causes of action. Different actions may seek the same form of relief (money damages) or different forms of relief, such as mandamus, money damages, prospective injunction and declaratory judgment. *See Khalsa v. Levinson*, 1998–NMCA–110, ¶ 19, 125 N.M. 680, 964 P.2d 844 (distinguishing "claim" from different forms of legal "relief"). The relief sought may also be "different" where one plaintiff seeks a form of injunctive relief that is contrary to the injunctive relief sought by another plaintiff. Plaintiffs that request money damages are not asking for different relief. Even though plaintiffs may be competing over the same pot, "the relief sought—that [Defendants] caused damage—[does] not differ." *Trotter v. Callens*, 89 N.M. 19, 22, 546 P.2d 867, 870 (Ct.App.1976).

{92} We conclude that "different relief" within the meaning of Rule 1–038(E) refers to situations where the relief requested by one party conflicts with the relief sought by another party. This is consistent with the underlying tenor of the Rule which recognizes parties on the same side may be in conflict with each other. Here, where each Plaintiff sought money damages, the relief sought does not differ. We note Plaintiffs made no argument that they were pur-

suing a limited fund, a situation that could potentially create a practical conflict between them.

{93} We next decide whether it was reasonable for the court to deny Plaintiff-wives an additional ten peremptory challenges under the facts before the court. The standard of review applicable to the allocation of peremptory challenges among multiple parties is an abuse of discretion standard. *See Gallegos ex rel. Gallegos v. Southwest Cmty. Health Servs.*, 117 N.M. 481, 485, 872 P.2d 899, 903 (Ct.App.1994). To determine whether multiple parties are diverse under the Rule, courts apply a four factor test. *Id.* We find the first three factors useful to determine whether parties are diverse because of the relief requested and we adopt it with some modification. To determine whether the relief is different, courts may consider "(1) whether the parties employed the same attorneys; (2) whether separate answers [or complaints] were filed; [and] (3) whether the [relief sought by the parties is] antagonistic." *See id.* "[T]he trial court should [also] consider the extent to which the alleged diversity of [relief] will affect the choice of individual jurors when considered in light of the common interests of [one plaintiff as against another plaintiff] in the selection of jurors." *Id.*

{94} Applying these factors to the facts before the trial court, we find that the court's decision to deny additional peremptory challenges to Plaintiff-wives was not an abuse of discretion. Plaintiffs employed the same counsel who filed one complaint on their behalf. This indicates that counsel perceived no conflicts in representing all four Plaintiffs. Plaintiff-husbands sought money damages for personal injury, lost wages, pain and suffering, etc. Plaintiff-wives sought money damages for loss of consortium and attendant care services for their husbands. They shared a common interest in holding Defendants liable for their damages. We perceive no reason why Plaintiff-wives would have selected different jurors. Nor do we perceive any conflict in the relief sought. Rather, there is a unity of interest in holding Defendants liable. We find no abuse of discretion in denying extra peremptory challenges to Plaintiff-wives.

### AAA Gas's Cross–Appeal

{95} AAA Gas raises three issues on cross-appeal: (1) the jury should not have been instructed that AAA Gas could be held strictly liable for a non-delegable duty, (2) the jury should not have been instructed on punitive damages, and (3) AAA Gas should have been awarded its costs pursuant to Rules 1–054 and 1–068 NMRA 2003. Because the judgment of the trial court in favor of Defendants remains undisturbed, we do not reach the issues of whether the jury instructions were proper. *See Moody v. Stribling*, 1999–NMCA–094, ¶ 47, 127 N.M. 630, 985 P.2d 1210 ("In order to appeal, a party must be aggrieved. To be aggrieved, a party must have a personal or pecuniary interest or property right adversely affected by the judgment.") (internal quotation marks omitted). We address only the issue of whether Defendants were entitled to costs under Rules 1–068 or 1–054(D).

{96} Following the entry of judgment, Defendant AAA Gas filed a cost bill in the amount of $43,492.92 as a prevailing party under Rule 1–054(D) and for post-offer costs under Rule 1–068. Following arguments, the trial court denied the cost bill and ordered that the parties bear their respective costs. AAA Gas contends that the court erred as a matter of law under Rule 1–068, which it argues required the trial court to award them post-offer costs. Moreover, Defendant asserts the court abused its discretion by refusing to award it costs as the prevailing party under Rule 1–054(D). We address each Rule separately.

### Rule 1–068

{97} Rule 1–068 provides in relevant part:

At any time more than ten (10) days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against him for the money or property or to the effect specified in his offer, with costs then accrued.... An offer not accepted shall be deemed withdrawn

*. . . If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.*

(Emphasis added.) AAA Gas made three offers of judgment. The first two were proffered while the case was pending in Valencia County on July 22, 1999, and January 19, 2000. The third offer was extended on March 30, 2000, after the Valencia County case was dismissed and Plaintiffs refiled their claims in Bernalillo County. AAA Gas requested an award of post-offer costs totaling $32,825.11. Although AAA Gas argued to the trial court that an award of costs under Rule 1–068 was mandatory, the court referred only to its discretionary authority to deny costs under Rule 1–054(D) and did not address the effect of the mandatory language of Rule 1–068 on its decision.

{98} AAA Gas argues that the award of costs is mandatory whenever the Rule 1–068 offer exceeds the judgment, whether the judgment is for or against Plaintiffs. Plaintiffs respond that the Rule should be harmonized with Rule 1–054 which grants the trial court discretion to award costs to a prevailing party. We agree with Plaintiffs, but that is not where our inquiry begins.

{99} The threshold question is whether Rule 1–068 applies where judgment is entered in favor of the defendant-offeror. *Delta Air Lines, Inc. v. August,* 450 U.S. 346, 350, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981). Our Supreme Court in *Dunleavy v. Miller,* 116 N.M. 353, 355, 862 P.2d 1212, 1214 (1993) recognized three outcomes when an offer of judgment is refused under Rule 1–068:(1) a judgment in favor of plaintiff exceeds the offer, (2) plaintiff does not receive an award, and (3) a judgment in favor of plaintiff is less than the offer. In *Dunleavy,* however, the Court addressed only the third scenario— where plaintiff's judgment is less than the offer. Whether the Rule applies when a judgment is entered in favor of the defendant is a question of first impression. "The interpretation of a [rule] is an issue of law that is subject to de novo review." *State v. Cleve,* 1999–NMSC–017, ¶ 7, 127 N.M. 240, 980 P.2d 23 (internal quotation marks omitted).

{100} "In construing Rule 1–068, which is identical to its federal counterpart, this Court may look to federal law for guidance." *Pope v. The Gap, Inc.,* 1998–NMCA–103, ¶ 10, 125 N.M. 376, 961 P.2d 1283; *see also Shelton v. Sloan,* 1999–NMCA–048, ¶ 24, 127 N.M. 92, 977 P.2d 1012. The Supreme Court has held that under the plain language of Rule 1–068, the Rule does not apply where the judgment is entered against plaintiff-offeree and in favor of a defendant-offeror. *Delta Air Lines, Inc.,* 450 U.S. at 351, 101 S.Ct. 1146 (reading "judgment finally obtained by the offeree . . . not more favorable than the offer" to exclude situations where judgment is *not* obtained by the offeree) (internal quotation marks omitted). The Court went on to conclude that this reading was consistent with the Rule's purpose—to encourage settlements. *Id.* at 352, 101 S.Ct. 1146. It was also consistent with Rule 1–054(D), which grants the court discretion to award costs to a prevailing defendant. If Rule 1–068 were mandatory in that situation, any offer by the defendant, no matter how small, would eliminate the trial court's discretion under Rule 1–054(D). *Delta Air Lines, Inc.,* 450 U.S. at 352–53, 101 S.Ct. 1146. A literal reading of Rule 1–068, the Court concluded, is evenhanded in its effect. It allows the trial judge to retain its Rule 1–054(D) discretion where a defendant prevails or where a plaintiff prevails and the judgment is greater than the offer; the Rule is mandatory only where the judgment for plaintiff is less than the offer. *Id.*

{101} The Court's reasoning is consistent with our decisions that make Rule 1–068 mandatory where a judgment for a plaintiff is less than the offer. *See, e.g., Dunleavy,* 116 N.M. at 360–61, 862 P.2d at 1219–20 (indicating desire to harmonize Rules 1–054 and 1–068); *Shelton,* 1999–NMCA–048, ¶ 1, 127 N.M. 92, 977 P.2d 1012 (noting "Rule 1–068 provides an incentive for defendants to make reasonable settlement offers before trial"); *Gilmore v. Duderstadt,* 1998–NMCA–086, ¶ 41, 125 N.M. 330, 961 P.2d 175 (discussing tension between Rules 1–054 and 1–068 and holding even if plaintiff could not receive costs under 1–068, pre-offer costs could be awarded to plaintiff as prevailing party under Rule 1–054); *Dickenson v.*

*Regent of Albuquerque, Ltd.,* 112 N.M. 362, 363, 815 P.2d 658, 659 (Ct.App.1991) (relying on federal law in construing Rule 1–068). We therefore adopt the Supreme Court's interpretation of Rule 1–068—that the Rule does not apply where a judgment is entered in the defendant's favor. Although we recognize that the holding of *Delta Air Lines, Inc.* has been criticized in the past, the holding remains the law, despite attempts to expand its scope, and most federal courts, as well as many state courts have followed the Court's ruling. *See, e.g., Fry v. Bd. of County Comm'rs,* 7 F.3d 936, 944 (10th Cir.1993); *Danese v. City of Roseville,* 757 F.Supp. 827, 831 n. 4 (E.D.Mich.1991); *Landon v. Hunt,* 938 F.2d 450, 451–52 n. 1 (3rd Cir.1991) (per curiam); *Hopper v. Euclid Manor Nursing Home, Inc.,* 867 F.2d 291, 293 (6th Cir.1989); *but see Darragh Poultry & Livestock Equip. Co. v. Piney Creek Sales, Inc.,* 294 Ark. 427, 743 S.W.2d 804, 805–06 (1988); *Beattie v. Thomas,* 99 Nev. 579, 668 P.2d 268, 274 (1983). When a judgment is entered in the defendant's favor, the proper relief is found under Rule 1–054. Accordingly, we hold that the trial court did not err in denying post-offer costs to AAA Gas under Rule 1–068. Since we have held that the decision to award these costs should be analyzed under Rule 1–054(D), we must determine whether the trial court abused its discretion in denying AAA Gas its costs.

### Rule 1–054(D)

{102} Plaintiffs' opposition to the award of these costs under Rule 1–054(D) was premised on their inability to pay. In AAA Gas's view, however, the court's ruling was impermissibly based on the financial disparity of the parties alone. AAA Gas also argues it was an abuse of discretion not to require Plaintiffs to disclose information relating to their indigence, specifically their workers' compensation benefits and Fisher Controls settlements. It does not appear from the record, however, that AAA Gas ever requested the court to have Plaintiffs disclose their workers' compensation settlement to substantiate a claim of financial hardship and we do not consider that contention. *See State v. Silver,* 83 N.M. 1, 2, 487 P.2d 910, 912 (Ct. App.1971) (declining to consider new conten-

tions on appeal where record did not reflect it was presented to the trial court).

{103} As to the remaining charges, this Court reviews the trial court's assessment of costs in a civil action under an abuse of discretion standard. *Key,* 2000–NMSC–010, ¶ 7, 128 N.M. 739, 998 P.2d 575; *Gallegos ex rel. Gallegos,* 117 N.M. at 489, 872 P.2d at 907. Under Rule 1–054(D)(1), "costs ... shall be allowed [as a matter of course] to the prevailing party unless the court otherwise directs." The Rule, therefore, creates a presumption that the prevailing party is entitled to costs. *Key,* 2000–NMSC–010, ¶ 6, 128 N.M. 739, 998 P.2d 575. The burden is on the losing party to "overcome this presumption by showing bad faith on [AAA Gas's] part, misconduct during the course of the litigation, that an award to [AAA Gas] would be unjust, or that other circumstances justify the denial or reduction of costs." *Id.* "[T]he losing party's ability to pay is a proper factor to consider in determining whether to award costs." *Gallegos ex rel. Gallegos,* 117 N.M. at 490, 872 P.2d at 908. Disparity in resources between the parties alone, however, "is not enough to justify a reduction in the cost award;" a court must also consider the losing party's ability to pay. *Key,* 2000–NMSC–010, ¶ 15, 128 N.M. 739, 998 P.2d 575. Nonetheless, "[i]f the trial court exercises its discretion not to award costs to the prevailing party it should articulate the reasons for its ruling, unless the basis for denying costs is readily apparent on the face of the record." *Id.* ¶ 9, 128 N.M. 739, 998 P.2d 575 (internal quotation marks and citation omitted).

{104} After hearing arguments from the parties, the trial court ruled:

> I agree with you, Mr. Morgan, that on the basis of the facts known to this Court and on the basis of the Court's reading of *Gallegos v. Southwest Community Health Systems* and *Key v. Chrysler,* ... it is my view that an award of costs against the unsuccessful plaintiffs in this matter, given the disparity of financial resources and for the other reasons advanced by plaintiffs' counsel, that the award of costs is denied.

{105} While the record indicates that the court considered the disparity of resources between the parties, its reference to *Gallegos* and *Key* and "the other reasons advanced by Plaintiffs' counsel," indicates that this was not the court's sole consideration. We review the record to determine if there is a reasonable basis for the denial. *Key,* 2000–NMSC–010, ¶ 9, 128 N.M. 739, 998 P.2d 575.

{106} Both at the hearing on Defendants' cost bills and in Plaintiffs' objections to Defendants costs bill and supporting memorandum, Plaintiffs' argument focused on their financial inability to pay a cost award. Counsel represented that Plaintiffs owed $28,000 in legal fees which they were unable to pay and he did not expect to collect. Counsel also presented evidence that Mr. Apodaca had just returned to work, some three years after the accident. He worked on a part-time basis as a school bus driver for $8.30 per hour and earned a small salary of approximately $800 per month as a pastor. Mrs. Apodaca did not work outside the home. Together, their annual gross income was roughly $15,600, a monthly income of $1,450. Moreover, Mr. Apodaca expected to have hand surgery which would entail an eighteen to twenty-four month recovery period during which he would be unable to work as a bus driver. The Velasquezes were somewhat better off. Although they earned a combined annual gross income of $56,400, they supported two young children, and Mr. Velasquez was attempting to replace approximately $200,000 worth of tools lost in the explosion that were his livelihood. Counsel also presented an affidavit from Plaintiffs itemizing their expenses and assets. After bills, the Apodacas had about $100 "extra" money per month and the Velasquezes had about $200 per month.

{107} As for the income generated from the settlement with Fisher Controls, we find the trial court had ample knowledge of that agreement and its contents even though Plaintiffs were never required to disclose it to AAA Gas for purposes of assessing costs. The record shows that the trial court inspected the sealed agreement in camera after an earlier evidentiary hearing. At that time, the court indicated it had reviewed the amount of the award. Having had access to this information, we conclude that the court was not required to disclose the confidential agreement to the opposing parties. We find that Plaintiffs did disclose the settlement to the trial court and that the court could take that information into consideration in its assessment of the cost award.

{108} In light of the evidence above, we conclude that the trial court's decision to deny Defendant's costs was reasonable and not an abuse of discretion. Consistent with our case law, the court did not limit its consideration to the parties' disparity in wealth. Instead, the court properly considered the evidence relevant to the parties' ability to pay. The Apodacas clearly were not in a position to pay Defendant's costs. Although the Velasquezes had more resources than the Apodacas, there were other factors the trial court could have taken into consideration given the evidence presented.

## CONCLUSION

{109} For the reasons stated above, we affirm the judgment below. Defendant AAA Gas's cross-appeal is denied.

{110} IT IS SO ORDERED.

FRY and KENNEDY, JJ., concur.